FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAY 17 2021

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

DESTINY CLIFFORD,       )
   Plaintiff,       )
                )
                )
v.                )    Civil Action File No. _____
                )
                )    **1:21-CV-2077**
WELLSTAR HEALTH SYSTEM,       )
VANGIE DENNIS, NERISSA       )
THOMPSON, SHARON BOSTON, et al.,)
   Defendants       )

### COMPLAINT FOR DAMAGES

COMES NOW Plaintiff DESTINY CLIFFORD (hereinafter referred to as the "Plaintiff") and files this Complaint for Damages against the Defendants named above, failure to accommodate, adverse job action based on a disability, employer harassment, discrimination in the workplace, retaliation

### PARTIES, JURISDICTION, AND VENUE

1.

Plaintiff, DESTINY CLIFFORD, a resident of the State of Georgia, is the proper party to bring the claim for her collective damages.

2.

Defendant, WELLSTAR HEALTH SYSTEM (hereinafter referred to as "Defendant WELLSTAR") is a Georgia domestic organization with its principal office located at 793 Sawyer Road, Marietta, Georgia 30062. Defendant WELLSTAR HEALTH SYSTEM, is subject to the jurisdiction and venue of this Court pursuant to O.G.C.A. § 14-2-510 and Article VI, § II, ¶IV of the Georgia Constitution. Service of process may be perfected upon Defendant WELLSTAR HEALTH SYSTEM's registered agent for service of process, by delivering an original Summons and Complaint to LEO REICHERT, 793 Sawyer Road, Marietta, Georgia 30062. When served in the manner prescribed by law, Defendant WELLSTAR HEALTH SYSTEM, shall be subject to the jurisdiction of and venue in this Court.

3.

Defendants VANGIE DENNIS, NERISSA THOMPSON, and SHARON BOSTON are residents of Georgia and subject to the jurisdiction and venue of this Court pursuant to Article VI, Section II, ¶4 of the Georgia Constitution, jurisdiction and venue are proper as to all Defendants in Fulton County, Georgia. Service may be perfected upon Defendants VANGIE DENNIS (Executive Director of Surgical Services), NERISSA THOMPSON (PACU Manager), and SHARON BOSTON (Human Resources Representative) by delivering original Summons and Complaint to defendants at their place of business, located at 303 Parkway Drive NE, Atlanta, GA 30312. When served in the manner prescribed by law, Defendants shall be subject to the jurisdiction of and venue in this Court.

## THE OPERATIVE FACTS

4.

## I.    Ms. Clifford Is Hired By AMC

On August 7, 2017 the Plaintiff received an 'Offer Letter' for a RN Unit Coordinator position

in the Post-Anesthesia Care Unit ("PACU"). The Plaintiff accepted and attended the 'New

Employee Orientation' on August 28 and 29, 2017. **EXHIBIT__A__**

5.

## II.    Ms. Clifford Has A Stroke

On December 2, 2018, *(16 months since hire)* the Plaintiff suffered from a hemorrhagic

stroke and was admitted to Piedmont Atlanta Hospital into the Critical Care Unit. The Plaintiff

was discharged on January 7, 2018. **EXHIBIT__B__** The Plaintiff has a medical condition that

constitutes a disability for purpose of the ADA and is protected by the EEOC form employment

discrimination Title II of the Civil Rights Act of 1964.

6.

On December 18, 2018, Neurologist DR. PAUL KING issued a 6-week excuse of

absence for the Plaintiff. **EXHIBIT__C__**

7.

On December 21, 2018, Neurologist DR. PAUL KING completed an INJURY/ILLNESS

form. **EXHIBIT__D__**

8.

On January 3, 2019, DR. KING issued a Health Release Form indicating that the Plaintiff was *able to return to work with no restrictions*. EXHIBIT__E__

9.

On January 3, 2019, DR. KING issues the Plaintiff a ***may return to work on the week of*** January 7, 2019. **EXHIBIT__F__**

## III.   Ms. Clifford Returns Back To Work

10.

The Plaintiff's return back to work was on 1/8/2019.

11.

On January 27, 2019, *(2 weeks after returning to work)* the Plaintiff reports having increased feelings of drowsiness to Defendant NERISSA THOMPSON.

12.

The Plaintiff was suffering due to side effects of the prescribed medications **(Amlodipine, Fioricet, Clonidine Patch, Hydralazine and Keppra).** The side effects of theses medication can consist of drowsiness, dizziness, unusual tiredness, or weakness.  These side effects are common an can last for several weeks. The Plaintiff was told if side effects last or get worse she is to call her physician immediate. **EXHIBIT__B__**

13.

Having concerns for her health, the Plaintiff calls the office of her Neurologist DR. PAUL KING. The Plaintiff was scheduled immediately for an appointment for January 29, 2019.

14.

DR PAUL KING'S business of operation is located on the same Wellstar campus (Wellstar Medical Group), which allows the Plaintiff to make her immediate scheduled appointment without delay.

## IV.   Ms. Clifford First Accommodation - No Night Call For (2) Months

15.

On January 29, 2019, the Plaintiff, was assessed by the physician, recommendations were given, and a *'Letter of Accommodation' states to return to 'full duty' immediately with the following restrictions: no night call for two months*. **EXHIBIT__G__**

**The Plaintiff experienced a left side hemorrhagic stroke, which means cognitive symptoms like memory loss, critical thinking, judgment, reasoning and some levels of cognitive impairments could occur.  EXHIBIT__B__**

16.

The Defendant NERISSA THOMPSON and VANGIE DENNIS received a copy of the Plaintiff's accommodation immediately after her visit with Dr. King on 2/29/2019. **EXHIBIT__G__**

17.

In spite of the Plaintiff's accommodation being received, Defendant THOMPSON and Defendant VANGIE DENNIS, showed disregard for the Plaintiff after she exercised her right to have an accommodation. **EXHIBIT__H__**

18.

The Plaintiff returned to work on 1/8/2019 as the Clinical Coordinator. The Plaintiff performed routine task related to the coordinator position until an accommodation was received, by the Defendant THOMPSON and Defendant DENNIS. **EXHIBIT__A__**

19.

The Plaintiff's responsibility for managing the nursing staff, establishing and maintaining the staff schedule were being ceased without reason. **EXHIBIT__A__**

20.

Defendant THOMPSON takes over the Plaintiff's responsibility and establishes the work schedule. The Defendant makes the schedule (dated February 10, 2019 through April 6) and intentionally places the Plaintiff on the 'on call' schedule.

21.

The Plaintiff was scheduled to work on 2/10/2019. Based on the Plaintiff's accommodation she is not to work the 'on-call' shift. From the time of receiving the Plaintiff accommodated dated 2/29/2019, Defendant THOMPSON has 12 days to find a replacement nurse for February 10, 2019. **EXHIBIT__I__**

22.

Defendant NERISSA THOMPSON was hired as the Nursing Manager of the PACU Department where she is fully responsible for staffing. If staff nurses do not volunteer to cover the Plaintiff's scheduled 'on-call' shift dated for 2/10/2019, then Defendant THOMPSON is expected to cover the shift. **EXHIBIT__A__**

23.

On February 10, 2019 (Day of call), Defendant NERISSA THOMPSON called and confronted the Plaintiff. Defendant NERRISA THOMPSON states to the Plaintiff that she ***could not refuse 'night-call'*** because when she 'initially' returned 'back to work' the physician *did not issue a restriction.* Defendant THOMPSON states that the Plaintiff's ***accommodation was not legit*** and that she should have had the accommodation before returning back to work. Concluding, that if she needed an accommodation then she should have stayed home. EXHIBIT__F__

24.

On February 10, 2019, Tika Anderson RN, is the nurse that needed to be relieved from patient care duty in PACU. Tika Anderson RN calls the Plaintiff and states that the Defendant NERRISA THOMPSON told her that she expects the Plaintiff to be at the hospital. EXHIBIT__I__

25.

The Plaintiff responds back to Defendant THOMPSON (via text) the following: (1) Against Medical Advice, *'I will be in',* (2) Apparently my health is not being considered, (3)

This is the doctor's order). (4) The Plaintiff also forwards a ***second copy*** of her accommodation to Defendant NERISSA THOMPSON. **EXHIBIT__J__**


## V.    Ms. Clifford, Second Accommodation - No Night Call For (3) Months

26.

On February 5, 2019, the Plaintiff received a letter from WELLSTAR Benefits Department Representative LATONYA WOODS stating that The Benefits Department has been notified of the Plaintiffs request for an accommodation. TANYA WOODS states the Health Release Form needs to be updated by the physician and returned in her office ***by February 15, 2019***. **EXHIBIT__K___**

27.

On February 12, 2019, DR. KING reassessed the Plaintiff's condition, and then updated the Plaintiff's Health Release Form, and stated ***no night call for 3 months***, extending the accommodation time. **EXHIBIT__L__**

28.

On February 12, 2019, the same day he Plaintiff visits the physician's office, the Plaintiff visits the Benefits Department to provide LATOYA WOODS (Benefits Analyst) a copy of the Plaintiff's updated Health Release Forms as requested.

29.

The requested documents were updated and received by the Benefits Department in a timely manner. **EXHIBIT __G__**

30.

WOODS state the Plaintiff's *__initial accommodation dated on 2/29/2019 was fully legit__* *__on 2/10/2019,__* the day the Plaintiff was assigned to work the 'on-call' shift. WOODS state that she just wanted to update the record.

31.

During this visit the Plaintiff confided in WOODS, stating (1) that she is having difficulty with the numerous medications prescribed. **EXHIBIT__M__** (2) that she has been harassed and treated unfairly since she presented the initial accommodation to Defendant DENNIS and Defendant THOMPSON, (3) and then made a request for WOODS to present the second accommodation, because the Plaintiff states that she is afraid of being how they may respond once Defendant THOMPSON and Defendant DENNIS see that the *__accommodation was revised__* *__by the physician to return to full duty with no night call for 3 months instead of 2 months.__* **EXHIBIT__L__**

32.

WOODS states that this behavior should not exist in the workplace, and that she will handle all future transactions with Defendant DENNIS and Defendant THOMPSON for the Plaintiff. WOODS presents the second accommodation. **EXHIBIT__L__**

33.

February 20, 2019 LATONYA WOODS (Benefits Analyst) sends the Plaintiff a request. The request is to have the Plaintiff's doctor fax a note or email as to *'why'* the Plaintiff cannot take night call? Stating that she needs to have this document as part of the 'LEAVE' file for the

accommodation request. **EXHIBIT__M__** On February 27, 2019 the note was emailed from Dr. King's office. **EXHIBIT__N__**

## VI.   Ms. Clifford Accused Of (2) Medication Errors

### 34.

On February 21, 2019, Defendant VANGIE DENNIS and NERISSA THOMPSON removed the Plaintiff from the clinical setting into Defendant DENNIS office. The Defendants states that **2 *medication errors*** occurred on 2/19/2019 on the medical floor regarding (1) an ON-Q Ball (pain pump) which was not attached to the patient's IV catheter after being transported to the medical floor, that the 'ON-Q' Ball was missing for hours, and that it was later found at midnight, in an unlocked and unsecured in a cabinet located in the PACU department; concluding that the post-surgical patient suffered, and (2) a surgical patient was transported to the medical floor without their IV Heparin tubing attached to the IV pump.

### 35.

The Plaintiff states that she was not responsible for the 'ON-Q' ball, that Nurse Annie V. transported the patient.

### 36.

The Plaintiff was instructed to write about whatever she could remember about each incidents. **EXHIBIT__O__, EXHIBIT__P__**

37.

The Plaintiff states that she transported the patient to the medical floor with the Heparin drip tubing inside the chamber; however the tubing was removed for approximate 2 minutes because the pumps were being exchanged. Extra care was given because the medication was a blood thinner.

**1)** **It is standard protocol, that when IV Heparin is being administered, the nurse is expected to place the drip on pause for 5 minutes prior to obtaining the blood product (PTT, PT/INR, Anti-Xa, CBC ect). EXHIBIT__Q__**

**2)** **If a IV Heparin infusion is stopped for 3-5 minutes, NO intervention is required by the nurse, unless the infusion has been interrupted for ninety (90) minutes. __Q__**

38.

The receiving nurse (new employee) on the medical floor; seemed disgruntled about receiving a patient care on an IV Heparin drip. As a leader in the acute care setting and experienced critical nurse, the Plaintiff states that most novice nurse find the task to be challenging at first when caring for a patient n a IV Heparin drip.

39.

The Plaintiff states, it does no make any sense for a nurse to remove IV tubing from any chamber if a medication is infusing, especially Heparin. The Plaintiff states that whomever made the alleged report that the tubing was off of the pump while transporting a patient on heparin must have misrepresented the instance regarding the IV tubing. The Plaintiff states that the IV

tubing being off of the pump is untrue and is based on a false premise that mischaracterized the situation.

40.

Hand-off was given. Both nurses verified the orders and confirmed the settings. Both nurses signed off in EPIC. The patient was stable, with no bruising or bleeding and no injury or harm made the patient. The Plaintiff spoke with the medical floor charge nurse to confirm that there are no issues. __Q__

41.

The Plaintiff has many years of experience working in the critical care with IV Heparin patients.

42.

Defendant VANGIE DENNIS makes known to the Plaintiff that the IV Heparin case has been escalated to higher management and was being investigated very seriously.

## VII.   The Clinical Coordinator Role Is Not Needed

43.

Immediately after the Defendant's received the second accommodation issued by DR. PAUL KING, dated February 12, 2019, the Plaintiff, was notified by Defendant NERISSA THOMPSON that the plaintiffs role no longer needed, without causation or explanation as to why.  The Defendants statement was witnessed by Kristina R, the Operating Room Nurse Educator, as she walked in the door.

44.

The Plaintiff was progressively removed from her position as the Clinical Coordinator. The Plaintiff was prevented from exercising any leadership role equivalent to the capacity of a Clinical Coordinator. The Plaintiff was prevented form interacting on a continuous basis with other departments by directing activities toward problem solving. The character of the Plaintiff's profession position had changed to that of a weaker position, a position of lesser importance and seriousness. The Plaintiffs authority, was purposely being undermined by the Defendant NERISSA THOMPSON, causing staff members to disrespect the Plaintiff. The Plaintiff was prevented from performing employee evaluations. Defendant THOMPSAON shut down professional communication with the Plaintiff, did not allow the Plaintiff to know, or assist in employee staff meetings as the Clinical Coordinator. Defendant THOMPSON, did not want to engage in daily feedback as necessary regarding staff member performance issues, by allowing her to work with staff to resolve department issue. The Plaintiff asked Defendant THOMPSON, if she wanted her to step down (voluntarily) from the position because she could see the she was been retaliated against and headed for a possible dismissal. **EXHIBIT__A__**

45.

Defendant Nerissa Thompson began shifting authority to the Plaintiff's subordinates, allowing staff members to carry out task that were obviously the responsibility of the Clinical Coordinator.

a) The Plaintiff was gradually removed from her private office without cause without reason. The Defendant Nerissa Thompson allowed the Plaintiff's workspace to be freely

occupied by the staff for eating and lounging at the Plaintiff's desk instead of having the employee utilize the designated break room, located directly in the room.

b) On 2/29/2019 the Plaintiff made a request to Defendant THOMPSON stating that she would take 'weekend day-call' to help with the 'call-schedule'; nonetheless, Defendant Thompson refused the Plaintiff, stating that she will no longer have 'weekend day-call'; however the Defendant scheduled other nurses, 'per diem/PRN' nurses throughout on both schedules. The triangles on the schedule signify 'day call'. **EXHIBIT__I___**

c) After Defendant NERISSA THOMPSON received the Plaintiff's 'second' accommodation, texted the Plaintiff suggesting that she can take the day of workbecause the census is 'LOW". The Defendant THOMPSON shows favor to 'PRN/per diem' staff, by allowing them to work, and flex the Plaintiff off work. The Plaintiff is a 'full-time' employee, working an hourly wage. NOTE: Keeping 'PRN/Per Diem' staff and flexing full-time employees off work is 'against company policy'. **EXHIBIT_____, EXHIBIT__I__** *(2/28/2019) Three 'as needed' staff members are on the schedule.*

d) Staff members, spoke to the Plaintiff in confidence stating that they were informed not to consult, discuss any clinical, staffing or personal matters with the Plaintiff, although this is the responsibility, of the Clinical Coordinator.

e) Thursday, February 28, 2019 a staff member confided with the Plaintiff, warning her to be careful, and watch whom she talks with, because the Defendant VANGIE DENNIS and Defendant NERISSA THOMPSON are up to no good. **EXHIBIT__I__**

f) On February 29, 2019 the Plaintiff (via email) is informing Defendant NERISSA THOMPSON about the issues on the floor with the staff, since her leadership position

has changed. The nurses were  Usually, when acting in the Clinical Coordinator position

the coordinator has the autonomy to resolve issues with staff. Defendant THOMPSON'S

response was that she will set up a meeting with Vangie.

g) The Defendant NERISSA THOMPSON, told the Plaintiff that she would like her to start

rotating into staffing to allow her subordinates to act as charge (Annie and LaQuanta).

(The Clinical Coordinator do not take patient assignments, unless the Clinical

Coordinator sees that it is necessary). This also shows that the Plaintiff's role as the

Clinical was changed, and authority gone, as it was recommended that the Plaintiff's

subordinates manage her.


## VIII. Administrative Leave Pending An Investigation

46.

On March 6, 2019, *(after 24 actual work days since the Plaintiff's returned back to*

*work),* although the Plaintiff had never received a formal write up of any kind since being

employed with Wellstar Atlanta Medical Center, the Plaintiff was placed on 'Administrative

Leave', pending a full investigation, regarding the IV Heparin instance and the missing ON-Q

ball (pain pump). The Plaintiff was removed from patient care, asked to gather her personal

items, and immediately escorted out of the building by Defendant NERISSA THOMPSON. The

Plaintiff never received any feedback report of the managerial investigation as promised by

Defendant VANGIE DENNIS. No policy and procedure, or terms of the Plaintiff's removal.

Defendant SHARON BOSTON, Defendant VANGIE DENNIS, and Defendant NERISSA

THOMPSON, told the Plaintiff that they will email her.

## IX.    Ms. Clifford Reports Harassment & Retaliation

47.

On March 7, 2019, the Plaintiff submitted harassment and retaliation claims on two differ
emails to Defendant SHARON BOSTON (Sr. Human Resources) asking to discuss the matters.

which quickly detailed a hostile work environment that the Plaintiff was subjected to
upon her return to work after submitting her accommodation at WELLSTAR Atlanta Medical
Center. The Plaintiff also made known to the Defendant that she wanted to meet.
**EXHIBIT__R__** (*View lettered Paragraphs D, E, G, H, I and L*)

48.

On March 8, 2019, the Plaintiff returned to the Wellstar Human Resource Department to
visit Defendant SHARON BOSTON to gather documents that were not presented at the
Administrative Leave meeting on March 6, 2019.  The Plaintiff's visit was to create an official
harassment, retaliation and discrimination complaint with Defendant SHARON BOSTON for the
record, regarding harassment and intimidation pertaining to the Defendant's Nerissa Thompson
and Vangie Dennis since her returned back to work after her stroke, and obtaining an
accommodation,  as mentioned in her email.

49.

Defendant SHARON BOSTON states that at the moment she was very busy and she and
the Plaintiff would need to talk and address her issues later, concluding her statement saying she
would reach out to the Plaintiff via email.  **EXHIBIT__S__**

50.

The Plaintiff was informed by the secretary that the facility did not have any documentation regarding *'administrative leave'* and *no polices and procedures* regarding the Plaintiff's violations where obtained by Defendant Sharon Boston. The secretary suggested that the Plaintiff call Erika Bickerstaff's (President of Human Resources) office and ask if she was aware. The Plaintiff left a message on her voice machine because Erika Bickerstaff's voice machine, as she was not available at the time.

51.

Defendant SHARON BOSTON assured the Plaintiff that her harassment claim would be taken seriously and that she would be contacted to follow up on the matter. Defendant SHARON BOSTON (Sr. Human Resources Rep.) never contacted the Plaintiff regarding her harassment claim. **EXHIBIT__S__**

52.

Defendant SHARON BOSTON failed to follow-up on the harassment claim, and only contacted the Plaintiff on July 11, 2019 *(several months later)* to notify the Plaintiff that the Defendant VANGIE DENNIS wanted to meet to discuss the results of the investigation. The meet date was scheduled for July 15, 2019 at Wellstar Atlanta Medical Center. **EXHIBIT__T__, EXHIBIT__U__**

## X.    Report Made With Corporate Office Compliance Hotline

53.

On July 13, 2019, the Plaintiff made a report via the WELLSTAR HEALTH SYSTEMS Corporate Office Compliance Hotline. The Plaintiff was instructed by the office *to only give the last date* of harassment and retaliation experienced by the Defendants VANGIE DENNIS and NERISSA THOMPSON. **EXHIBIT__V__**

## XI.   Ms. Clifford's Termination

54.

On July 15, 2019, the Plaintiff met with Defendants VANGIE DENNIS (Executive Director of Surgical Services), NERISSA THOMPSON (PACU Manager), SHARON DENNIS (Sr. Human Resources Representative) and Erika Bickerstaff (President of Human Resources) after more than 4 months of being on administrative leave. When the meeting began, the Plaintiff was instructed not to talk. Defendant VANGIE DENNIS proceeded, stating to the Plaintiff that she has been terminated from her position, due to what was deemed a "Violation of WELLSTAR Policy" (MU-70-01) printed on the Plaintiffs 'SEPERATION NOTICE'. *No investigatory report was given, nothing regarding the matter, in any capacity, and not one member would discuss anything with the Plaintiff.* See NOTICE OF CLAIM FILING AND REQUEST FOR SEPARATION INFORMATION **EXHIBIT__W__**

55.

On the Plaintiff's discharge paperwork (EMPLOYEE COUNCSELING REPORT), Defendants VANGIE DENNIS and NERISSA THOMPSON stated that the Plaintiff violated a "National Patient Safety Goal," **EXHIBIT__X__,** which does not identify any violation related

to the Defendant 'Wellstar's claim regarding IV Heparin tubing not connected to the pump while transfusing.

56.

**ON    8/1/2019    SHARON    BOSTON    (SR.    HUMAN    RESOURCES REPRESENTATIVE) states, the reason the Plaintiff was discharged on 7/15/2019 is the following (view, NOTICE OF CLAIM FILING AND REQUEST FOR SEPARATION INFORMATION) #2:**

**2.     Ms. Clifford was discharged for violation of policy (MU-70-01) –CONTINUOUS IV HEPARIN THERAPY PROCEDURE. This was due to her accepting a patient from the OR Unit with a Heparin infusion and later delivering the patient to the medical floor with the Heparin not being connected to the IV pump, as stated on number (2) of the** NOTICE OF CLAIM FILING AND REQUEST FOR SEPARATION INFORMATION **EXHIBIT__Y__**

The *following reason for separation terms have changed the direction of the Defendant's claim. GDCR ATTORNEYS AT LAW - Gregory, Dole, Calhoun & Rogers, LLC.*

**The Respondents, Wellstar Atlanta Medical Center (for charge No. 410-2019-0718) states on July 2, 2021 Section III. Ms. Clifford's employment is terminated due to -- her failure to ensure a patient was receiving medication as prescribed by the patient's doctor. The reason for termination has changed in this passage. The direction of Wellstar's claim is shifting in another direction, which was not the reason for termination as documented in the** NOTICE OF CLAIM FILING AND REQUEST FOR SEPARATION INFORMATION sent to the Department Of Labor.

Wellstar Atlanta Medical Center does not posses the (MU-70-01) policy to state a violation.

## XII.   The Department of Labor - Filing

57.

On July 21, 2019 the Plaintiff, filed with the Department of Labor for unemployment benefits.

58.

Defendant WELLSTAR attempted to deny the Plaintiff unemployment benefits due to what they characterized as a violation of company policy. In pursuit of evidence validating the termination of the Plaintiff, the Georgia Department of Labor issued WELLSTAR a "Notice of Claim Filing and Request for Separation Information." **EXHIBIT__Y__**

59.

In response to the Department of Labor request, Defendant WELLSTAR's Human Resource Department submitted a policy and procedures document (MU-70-01 CONTINUOUS IV HEPARIN THERAPY PROCEDURE) from Wellstar Windy Hill Hospital, effective as of March of 2018, was submitted to the Department of Labor in spite of the fact that it was not pertinent to the WELSTAR Atlanta Medical Center policies and did not directly address the alleged violation directly. **EXHIBIT__Q__**

60.

The Department of Labor deemed the policy and procedures document submitted by Defendant WELLSTAR as insufficient to prove that the Plaintiff violated WELLSTAR Atlanta

Medical Center policy due to the fact that the document didn't directly address the alleged

violation (The IV tubing was not connected to the pump while patient in transport) and was not a

document presented to WELLSTAR Atlanta Medical Center employees. Therefore, the

Plaintiff's unemployment benefits were approved. **EXHIBIT__Z__**

61.

The Department of Labor gave Defendant WELLSTAR the opportunity to appeal the

determination to approve the Plaintiff's unemployment benefits. **EXHIBIT__Z__**

62.

Since the Defendant WELLSTAR failed to file the appeal in the allotted time, on October

23, 2019, the Department of Labor claims examiner's original ruling was upheld, signifying the

fact that the documentation submitted by the Defendant WELLSTAR initially was insufficient

and did not prove that a violation of WELLSTAR Atlanta Medical Center policies and

procedures had occurred. **EXHIBIT__Z__**

## XIII. Equal Employment Opportunity Commission (EEOC) - Filing

63.

On July 22, 2019, the Plaintiff initiated a claim against the Defendant WELLSTAR with

the Equal Employment Opportunity Commission (hereinafter referred to as the EEOC) for

disability discrimination (EEOC Claim# 410-2019-07187) which is a violation of Section I of the

Americans with Disabilities Act of 1990. **EXHIBIT__AA__**

64.

On February 19, 2021, the Defendant was issued a "Right to Sue" letter from the Equal Employment Opportunity Commission (EEOC), as a result of an investigation of a discrimination claim made by the Plaintiff on July 22, 2019. The EEOC document notified the Plaintiff that she had 90 days from the time of receipt of the letter, to bring forth legal action against her former employer based on her discrimination claim. **EXHIBIT__BB__**

## XIV.  Securing Needed Information

65.

It is imperative that we secure any and all information from the hospital related to this matter in order to make a more accurate assumption of value.

## COUNT I

## DISCRIMINATION – FAILURE TO ACCOMMODATE

66.     Plaintiff  and incorporates paragraphs 1-32 above, as if fully set forth herein.

67.     The letter 'G' H 'I''J' and 'L' contain accommodations from the Plaintiffs doctor that appears were not taken seriously.

68.     The EEOC was very clear about the status in their "Right to Sue" letter 'BB'.

69.     In Title 42 US Code § 12112 – Discrimination was not regarded.

70.     In Title 6 Court Federal Regulations Sections 15.30 was not considered.

71.     In Title 34 Official Code of Georgia Annotated Section 6A-4 – Prohibited Discriminatory Activities states:

**OCGA § 34-6A-4(c) States:**

> *"No labor organization shall exclude or expel from its membership or* ***otherwise discriminate against individuals*** *because of their disability; nor shall a labor organization limit, segregate, or classify its membership...* ***or conditions of employment*** *because of such person's disability."*

## COUNT II

## DISCRIMINATION – ADVERSE ACTIONS BASED ON DISABILITY

72.     Plaintiff and incorporates paragraphs 1-56 above, as if fully set forth herein.

73.     The letter A'F'G' H 'I' L' 'O' 'R' Q' 'P' 'T' 'X' 'S' were not regarded.

74.     The EEOC was very clear about the status in their "Right to Sue" letter 'BB'.

75.     In Title 42 USC § 12112 – Discrimination was disregarded.

76.     In Title 6 CFR § 15.30 – General Prohibitions Against Discrimination was not used.

77.     In Title, OCGA § 34-6A-4 – Prohibited Discriminatory Activities based on the section.

## COUNT III

## HARASSMENT

78.     Plaintiff and incorporates paragraphs 1-56 above, as if fully set forth herein.

79.   In letter 'G' there are implications that allude to your work status.

80.   In Title OCGA § 16-11-39.1 Harassing Communications; venue; separate offenses, impact on free speech was not given the token or satisfaction.

81.   In Title 42 USC § 12112 – Discrimination was disregarded.

## COUNT IV

## DISCRIMINATION – ESTABLISHING A WORKPLACE THAT IS DISCRIMINATORY

82.   Plaintiff and incorporates paragraphs 1-56 above, as if fully set forth herein.

82.   In letters A'F'K'G'I'J'L'P'O'P'Q'R'S'U'V' Wand CC' the determinations are made by both EEOC and the DOL regarding the failure to prove that the claim for filing was effective.

84.   In Title 42 USC § 12112 – Discrimination was disregarded.

85.   In Title 6 CFR § 15.30 - General prohibitions against discrimination were not regarded.

86.   In Title OCGA § 34-6A-4 – Prohibited discriminatory activities were disregarded.

## COUNT V

## RETALIATION

87.   Plaintiff and incorporates paragraphs 1-56 above, as if fully set forth herein.

88.   In letter A'G'I'J'K'I'L'V'X'O'P'Q'R'S'U' and W there was an understanding between Vangie Dennis and the Plaintiff, she was to be relocated to another unit because she felt that the treatment was unfair.

89.     In Title OCGA § 34-6A-501 - Retaliation by employers against employees; labor organization members states:

OCGA § 34-6A-5, states:

> *"No employer shall discharge, expel, refuse to hire, or otherwise discriminate against any person or applicant for employment because such person has opposed any practice made an unfair employment practice by this chapter or because such person has filed a charge, testified, assisted, or participated in any manner in an investigation, action, proceeding, or hearing under this chapter; nor shall any employment agency discriminate against any person; nor shall a labor organization discriminate against any member or applicant for membership for such reasons."*

## COUNT VI

## PUNITIVE DAMAGES

90.     Plaintiff incorporates paragraphs 1-56 above, as if fully set forth herein.

90.     Defendants' actions, as described above, showed willful misconduct, malice, wantonness, oppression, or that entire want of care that would raise the presumption of conscious indifference to consequences as contemplated under O.C.G.A. § 51-12-5.1

Punitive damages, as established by the evidence;

Such other and further relief as the Court may deem just and proper in light of the evidence

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Respectfully submitted this 17th day of May, 2021.

Respectfully submitted,

DESTINY A. CLIFFORD
Plaintiff

Destiny A. Clifford
Pro Se

265 18th Street NW
Apt. 2334
Atlanta, Georgia 30363
404.936.2689
Clifford@yahoo.com

State of _Georgia_
County of _Fulton_
Signed (or atested) before me on ___05-16-2021___ (date)
by _Destiny A Clifford_ (name of individual).
Signature of notarial officer: _____

Stamp

My commission expires: _02-16-2024_

26

Ms. Destiny Clifford's Damages/Penalties

Violating the American with Disabilities Act for the legally disabled, Unlawfully retaliate against them for exercising their right to obtain an accommodation (twice), Then harassing and discriminating creating a hostile work environment against them to demote them from they're hired position. Being unfair and placing them on Administrative Leave for a claim that under investigation they cannot prove, And then with intent, recklessly dismiss them unlawfully, is good reason for the employer to be penalized that this egregious act, and be established by the evidence, that this behavior should never happen again. A stroke survivor is already at a disadvantage, now to be without healthcare coverage, makes it worse

WHEREFORE, Plaintiff prays, in her respective and appropriate capacity for:

| | | |
|---|---|---|
| 1. | Discrimination - Failure to Accommodate x 2 | $600,000 |
| 2. | Discrimination- Adverse Actions Based on Disability | $600,000 |
| 3. | Harassment | $300,000 |
| 4. | Discrimination – Establishing a Workplace that is Discriminatory | $300,000 |
| 5. | Retaliation | $900,000 |
| 6. | Punitive Damages | 48,300, 000 |

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

DESTINY CLIFFORD,
   Plaintiff,

v.

WELLSTAR HEALTH SYSTEM,
VANGIE DENNIS, NERISSA
THOMPSON, SHARON BOSTON, et al.,
   Defendants

# EXHIBITS

| | |
|---|---|
| A | Wellstar Employment Welcome Letter |
| A | New Employee Orientation Sheet |
| A | New Employee Orientation Checklist |
| A | Facility Orientation Checklist |
| A | Unit/Department Orientation Checklist |
| A | Job Description – Coordinator Nursing Unit AMC |
| B | Piedmont Discharge Summary |
| B | Ms. Clifford Diagnostic Image – Hemorrhagic Stroke |
| C | Excuse for Absence |

D       INJURY/ILLNESS FORM

E       HEALTH RELEASE FORM

F       Return To Work Letter

G       (Accommodation) – Full Duty, No Night Call For Two Months

H       RIGHT FOR AN ACCOMMODATION

I       Staff Schedule/On Call Schedule

J       TEXT MESSAGE – Nerrisa Does Not Honor Accommodation

K       The Benefits Department – Need Update of Health Release Form

L       (Accommodation) – Full Duty, No Night Call For Three Months

L       Updated HEALTH RELEASE FORM

M       BENEFITS DEPARTMENT – Need Doctor's Note 'Why' No Night Call

N       Dr. Paul King's Response Note– To 'Why' No Night Call

O       Handwritten Statement: Missing ON-Q Ball (Pain Pump)

P       Handwritten Statement: IV Heparin No Tubing Attached To Pump

Q       (MU-70-01) CONTINUOUS IV HEPARIN THERAPY PROCEDURE

Q       The Standardization Process Is On Hold

R       3/7/19 EMAIL: Plaintiff to Sharon HR – WANT TO DISCUSS RETALIATION

R       3/7/19 EMAIL: Discrimination, Harassment & Retaliation Reported To - HR

S       3/8/19 EMAIL: Request for Documents - HR

S       3/8/19 EMAIL: Previous Filing of Harassment & Intimidation To – HR

S       7/10/19 EMAIL: Report of Discrimination to Wellstar's Counsel & HR

T       3/11/19 EMAIL: Thanking Plaintiff For Discrimination & Retaliation Complaint

U       7/11/19 EMAIL: Vangie Wants To Discuss The Investigation – 7/15/19

V       7/13/19 CORPORATE OFFICE COMPLIANCE HOTLINE – Report Made

W       EMPLOYEE SEPARATION NOTICE – 7/15/19

W       HOSPITAL NATION PATIENT SAFETY GOALS  - NPSG 03.05.01

X       EMPLOYEE COUNSELING REPORT – 7/15/19

Y       GEORGIA DEPARTMENT OF LABOR – Notice Of Claim Filing and Request

        For Separation Information

Y       GDCR ATTORNEYS AT LAW document/

Z       GEORGIA DEPARTMENT OF LABOR – Claims Examiner Determination

Z       GEORGIA DEPARTMENT OF LABOR – Appeals Tribunal

Z       GEORGIA DEPARTMENT OF LABOR – FACT FINDING INQUIRY

AA      EQUAL EMPLOYMENT OPPORTUNITY COMMISSION – Charge Of Discrimination

BB      EQUAL EMPLOYMENT OPPORTUNITY COMMIDSION – 'Right To Sue'

CC      TEXT MESSAGE – NERISSA 'FLEX' off full-time employees

# WELLSTAR



August 7, 2017

Destiny Clifford
231 18th st NW
apt 7421
Atlanta, Georgia 30363

Dear Destiny,

We are delighted to offer you the position of **RN Unit Coordinator** in the **PACU** Department at WellStar **Atlanta Medical Center** Hospital!   This position is FT with a base rate of pay of **$39.42** per hour. This is a contingent offer of employment and requires successful completion of WellStar's pre-employment requirements.

Please note the following important details regarding your offer:

- This position is eligible for the following shift differentials, depending on the clinical hours worked:  2nd shift: **$3.00**, 3rd shift: **$4.00**, Weekend: **$3.00**
- WellStar's nursing orientation is competency based and the length of time may vary, depending on successful completion and validation of clinical skills.  Your manager will be able to answer any questions regarding your individualized orientation plan.
- You will be contacted by **Keva Thomas**, Talent Acquisition Specialist to coordinate your pre-employment process including **drug screen, background checks and employee health appointment**.  The pre-employment requirements include: completion of satisfactory reference checks, a background check (including criminal), employee physical, drug testing, and if applicable  - primary source of licensing by the State of Georgia, as well as, proof of current and valid **Basic Life Support (BLS) certification and ACLS from the American Heart Association.**
- I have attached a summary of WellStar's benefits, including our medical, dental, voluntary retirement, work life services and time off.  This information will be reviewed during orientation and you will be able to meet one-on-one with a benefits counselor, if you choose.
- We have tentatively scheduled you to attend New Employee Orientation on **August 58, 2017**  This date may change based on completion of a comprehensive background check, new hire paperwork and post-offer, pre-employment employee health screening, including a drug and alcohol test. Please complete your drug and alcohol screening within the next 48 hours (see attachment).

We are very excited that you will be joining WellStar Health System!  Please let me know if you have any questions or need any additional information.

Warmest regards,

Tessa Reese
Recruiter
WellStar Atlanta Medical Center

By signing below. I accept this offer of employment.

_____          _____
Name                                                    , Date



As a WellStar team member, you play a critical role in our success in achieving our vision of delivering world-class healthcare. To ensure you are provided with the skills and resources to be successful in your role, we have designed a multi-pronged onboarding plan to support your development and growth. In the coming weeks, you will be completing eLearning modules, attending instructor-led courses and completing a job-specific orientation that will clarify expectations and support your success.

### Before Your First Day
Please make sure you have completed the following **prior** to attending New Employee Orientation:

☐ I-9 Form Section One (Online)



Please bring the following documents to New Employee Orientation (if not previously provided):

☐ I-9 Identification Documents
☐ DD-214 (if you have been in the military)
☐ Other: _____

### New Employee Orientation – Monday,  August 28, 2017
You have been scheduled to attend New Employee Orientation at the WellStar Development Center. New Employee Orientation begins promptly at 7:15 a.m. and the program will conclude at 4:00 p.m. A light breakfast and lunch will be provided. Your badge photo will be taken if you have not already completed this step. **Business casual attire is required** (no denim, open-toed shoes, shorts or capris allowed).

### Report to Department – Tuesday, August 29, 2017
Please report to your department. It is important that you reach out to your department manager prior to your first day to confirm your schedule.

### Your Onboarding Schedule
In addition to New Employee and Facility Orientation you may be required to attend onboarding training. Attached you will find an onboarding track which outlines your initial onboarding schedule. Additional details will be provided during New Employee Orientation. It is important that you reach out to your department manager to confirm your department schedule on days you are not attending onboarding training or your training ends early.

### Inclement Weather
Please note that in the event of inclement weather on a day you are scheduled to attend onboarding training (New Employee Orientation, Facility Orientation, Patient Care Orientation or WellStar Connect Training), your should visit www.wellstar.org or call 470-956-6400 to obtain up-to-date information on any potential delays or rescheduling. Should a campus be closed or delay opening due to weather conditions, an announcement will be published by 6 a.m. You should always use your best judgment about traveling depending upon road conditions in your area.

# Orientation Checklist

 **WELLSTAR.**   **New Employee Orientation Checklist**



| Employee Name: | Destiny Clifford | Employee Number: | 81009 |
|---|---|---|---|
| Department Name: | PACU | Job Title: | Clinical Coord. |
| Facility: | AMC (Downtown) | Employment Date: | Aug 28, 2017 |

**The following topics will be covered during New Employee Orientation:**

**I. General Topics**
- Employment Paperwork
- Employment Acknowledgement
- Lawson Employee Self Service
- Welcome
- Vision/Mission/Credo

**II. People Pillar**
- Cultural Competency
- Corporate Compliance
- WorkLife Services
- Benefits
- Workplace Safety

**III. Growth Pillar**
- Patient Experience/Customer Service
- WellStar Foundation

**IV. Financial Pillar**
- Time Reporting
- Pay Schedule

**IV. Quality Pillar**
- Safety First
- National Patient Safety Goals
- ADA
- Safe Medical Devices
- Hazardous Materials/MSDS
- Performance Improvement
- Emergency Preparedness
- Advanced Directives
- Durable Power of Attorney
- Confidentiality
- Worker's Compensation
- Emergency Codes and Responses
- Infection Prevention
- Fire/Electrical Safety
- Security Services/Parking
- Risk Management

Employee Signature: _____ RN BSN _____      Date: Aug 28 2017

Revised 010113



 **WELLSTAR.**　　　　**Facility Orientation Checklist**

| | | | |
|---|---|---|---|
| **Employee Name:** | Destiny Clifford | **Employee Number:** | 81009 |
| **Department Name:** | PACU | **Department:** | PACU |
| **Job Title:** | PACU Coord. | **Employment Date:** | Aug 28, 2017 |
| **Facility:** | AMC (Downtown) | **F/P/I:** | |

## The following topics will be covered during Facility Orientation:

**I. General Topics**
- Welcome
- Who We Are – Current Information, Happenings
- Upcoming Developments
- Facility Communications – Town Halls, Communication Boards, Partners
- Facility Leadership – DON, CSC, Controller
- Corporate Compliance

**II. Human Resources**
- Human Resources Respresentative
- Employee Discounts
- Employee Relations
- Forms

**III. Social Services**
- MSW Staff
- Critical Conditions
- Abuse & Neglect

**IV. Performance Improvement**
- PI Representative
- Explanation of Purpose/Process
- Current Facility/Department Projects

**IV. Security**
- Hospital Security Officer
- Parking
- Contact Numbers
- Current Issues

**V. Safety**
- Site Safety Officer
- Facility Information/Issues
- Resource Numbers

**VI. Customer Service**
- Customer Service Coordinator
- Function/Contact Information
- SHINE Program/Shining Star/WOW
- Communication Boards
- CSI Team Information

**VII. Pastoral Care**
- Site Chaplin
- Function/Contact Information
- Employee Assistance
- 

**VIII. Outpatient Behavioral Health**
- Outpatient Coordinator
- Facility Information
- Function/Contact Information

**IX. Volunteers**
- Facility Volunteer Supervisor
- Function/Contact Information

**X. Tour of Facility**

**Please note: This form does not replace the Unit/Department Orientation Checklist**

**Employee Signature:** _____ RN BSN **Date:** Aug 28, 2017

Revised 010113



# WELLSTAR. Unit/Department Orientation Checklist

| | |
|---|---|
| **Employee Name:** Destiny Clifford | **Employee Number:** 81009 |
| **Department Name:** PACU | **Department Number:** # 54515. |
| **Job Title:** Clinical Coord. | **Employment Date:** Aug 28, 2017 |

## The following topics should be reviewed immediately upon assignment:

| General Topics | | | |
|---|---|---|---|
| ☑ Introductions/Facility and department tours | | ☑ Isolation precautions | |
| ☑ Department organization structure | | ☑ Biohazardous waste | |
| ☑ Department mission, vision and strategic plan | | ☑ Evacuation Plan | |
| ☑ Credo values and patient experience expectations | | ☑ Emergency Codes and Responses | |
| ☑ Department security and access | | ☑ MSDS/Hazardous Materials | |
| ☑ Dress code | | ☑ Performance Improvement – LEAN | |
| ☑ Location of department manuals | | ☑ Patient rights | |
| ☑ Parking policy | | ☑ Accreditation | |
| ☑ Tobacco-Free policy | | ☑ Blood borne pathogen and tuberculosis plan | |
| | | ☑ Personal protective equipment | |
| | | ☑ Risk Management | |
| **People Pillar** | | ☑ Corporate Compliance | |
| ☑ Employee engagement action plan | | ☑ Incident Reports/Unusual occurrences | |
| ☑ Department communications/Staff meetings | | ☑ Work-related injury and/or illness | |
| ☑ Cultural competency and use of medical interpreters | | **Financial Pillar** | |
| ☑ Confidentiality and technology (HIPAA and PHI) | | ☑ Pay Days/Pay Checks | |
| ☑ Performance management and SuccessFactors | | ☑ Schedules/Meals/Breaks | |
| ☑ Reward and recognition | | ☑ Clocking In/Out | |
| ☑ Workplace safety policy | | ☑ Daily Attestation to Time | |
| ☑ Organizational Learning and training | | ☑ Calling Out/Contact: _____ | |
| ☑ SuccessFactors Learning and eLearning Modules | | ☑ PTO/EIB/Leave of Absence | |
| ☑ Annual training requirements (GAMES/Compliance) | | **Job Specific/Other** | |
| **Safety and Quality Pillar** | | ☑ Job descriptions/Job specific orientation | |
| ☑ Safety First | | ☑ Core/Role specific competencies | |
| ☑ Department Fire Plan/Equipment/Extinguishers | | ☑ Call System | |
| ☑ Alarms | | | |
| ☑ Department specific double checks (please write in):<br>1. none<br>2. | | | |

**Employee Signature:** _____ RN BSN  **Date:** Aug 28 2017

Revised 010113



# Job Description

A

| Job Title: Coord-Nursing Unit AMC | Reports To (Title): | Creation / Revision Date: 7/7/16 |
|---|---|---|
| Job Code: 0312 | *Director* | |
| Dept Number | Dept Name: *PACU* | |

| If this is a supervisory position, please complete these items | | |
|---|---|---|
| Job Titles Reporting Directly to this Position: | Responsible for the following: | |
| | Annual Budget $$ | # FTE's |

A job description defines the job to be performed by a fully qualified employee who possesses the knowledge, skills, and experience required for the position. This is not designed to be an exhaustive list of all activities performed in the job. This document should be reviewed and signed by the employee prior to or during department orientation and the original signed copy should be forwarded to Human Resources.

## JOB SUMMARY: a brief description of the job.

Under general supervision, assists the Nursing Manager in managing the 24 hour operation of the patient care unit and assumes those duties when necessary. Contributes to the establishment of routines to ensure excellence in patient care. Provides for the efficient use of resources, establishes use of resources, establishes and maintains staff schedule, and evaluates and coaches personnel. Functions as a staff nurse as necessary.

I would copy/paste the language in paragraphs 2, 3, and 4 of the "Clinical Coordinator" JD that was presented at CNO Council on 08.03.17.

## JOB QUALIFICATIONS: minimum requirements to be considered qualified to do the job.

Required <u>Minimum</u> Education: Bachelor's degree in Nursing and three years related nursing experience or Associate's degree in Nursing and five years related nursing experience

Required <u>Minimum</u> Experience: Two year's experience functioning in a RN charge nurse capacity or related nursing leadership role, preferably in the specialty area

Required <u>Minimum</u> Certification: Licensed as a Registered Nurse in the State of Georgia

Required <u>Minimum</u> Skills:
- Extensive knowledge of professional nursing theory and practice acquired through graduation from an accredited school of nursing.
- Extensive knowledge and skills in the application of the techniques and practices of the nursing profession.
- Ability to plan organizes and direct the work of professional and non-professional nursing personnel.
- Ability to direct and carry out prescribed medical treatments.
- Ability to maintain effective working relationships with fellow employees, patients, families and physicians

For Direct Patient Care positions, Indicate American Heart Association or American Academy of Pediatrics certification required:
- ☒ BLS   (Basic Life Support)
- ☒ ACLS ( Advanced Cardiac Life Support)
- ☐ NRP Neonatal Resuscitation Program
- ☐ PALS Pediatric Advanced Life Support

## PHYSICAL DEMANDS AND WORKING CONDITIONS: typically found in this job.

*Please List Physical Demands:*
*Examples include:  Frequent/routine walking, standing, stooping, assisting with positioning of patients, lifting while appropriately using safe patient handling while always optimizing the use of appropriate (lift) equipment and some sitting. Exposure to anesthetic gases, blood and body fluids, sharps, hospital grade cleaning solutions, flammable solutions: ie: alcohol, latex, etc. Work schedule may vary, dependent upon unit needs and travel between clinical assignments may be necessary. Ability to push/pull/transport materials of at least 20 pounds. Frequent/routine operation of telephone and computer equipment in a typical office setting. Periodic travel between office sites.*

Check one to indicate exposure to blood, body fluid, or tissues:  (double click box and select "checked")

☐ Category 1: This job poses the potential of occupational exposure in routine tasks performed.
☒ Category 2:  This job may pose the potential of occupational exposure.  Regular job tasks do not involve exposure, but the employee may have potential exposure in some tasks.
☐ Category 3: This job does not pose the potential of occupational exposure in any duties.

| WELLSTAR GENERIC/CORE COMPETENCIES (apply to all WellStar Team Members): |
| --- |

**Communication:** Communicates well both verbally and in writing, has good listening skills, builds strong relationships, shares information and ideas with others, solicits feedback and handles constructive criticism, listens attentively, asks clarifying questions, stays open to other viewpoints, creates accurate and punctual reports when needed, delivers presentations effectively.

**Customer Focus:** Builds customer confidence, is committed to increasing customer satisfaction, sets achievable customer expectations, assumes responsibility for solving customer problems, ensures commitments to customers are met, solicits opinions and ideas from customers, responds to internal customers.

**Financial Stewardship:** Plans for and uses resources efficiently, always looks for ways to reduce costs,

**Integrity/Ethics:** Deals with others in a straightforward and honest manner, is accountable for actions, maintains confidentiality, supports company values, conveys good news and bad.

**Teamwork/Dependability:** Meets all team deadlines and responsibilities, listens to others and values opinions, helps team leader to meet goals, welcomes newcomers and promotes a team atmosphere.  Meets commitments, works independently, accepts accountability, handles change, sets personal standards, stays focused under pressure, meets attendance/punctuality requirements.

**Job Knowledge:** Understands duties and responsibilities, has necessary job knowledge, has necessary technical skills, understands company mission/values, keeps job knowledge current, is in command of critical issues.

**Problem Solving/Analysis:** Breaks down problems into smaller components, understands underlying issues, can simplify and process complex issues, understands the difference between critical details and unimportant facts.

**Quality/Safety:** Is attentive to detail and accuracy, is committed to excellence, looks for improvements continuously, monitors quality levels, finds root cause of quality problems, owns/acts on quality problems.  Promotes mutual respect, demonstrates consistent application of safety absolutes and the Safety First Program and keeps workplace clean and safe.

| ROLE SPECIFIC COMPETENCIES, RESPONSIBILITIES, ROLES, AND FUNCTIONS:  A set of competencies and functions that define the job's reason for existence and the competencies needed to perform the job.  Not to be confused with core competencies.  3-8 role specific competencies and add supporting functions/responsibilities.  Provide the normal percentage of time spent on each major responsibility. | % of Time Spent Total 100% |
| --- | --- |
| 1. ENSURES COMPLIANCE WITH QUALITY STANDARDS OF NURSING CARE<br>• Makes daily rounds to assess the status of the patient and quality of care delivered<br>• Accompanies physicians on rounds to answer questions and resolve problems<br>• Evaluates daily a 10% sample of patient medical records to evaluate staff compliance with assessment/reassessment, problem identification, interventions and evaluation as per unit check list<br>• Provides daily feedback as necessary to individual staff members regarding their performance | 25% |
| 2. COMPLIANCE WITH HOSPITAL/ UNIT POLICIES, PROCEDURES, PROTOCOLS AND GUIDELINES<br>• Ensures that care is delivered to each patient in accordance with quality standards and that documentation reflects same in the medical record and on the kardex Replace with EMR Plan of Care<br>• Ensures appropriate preparation of patients for surgery or other procedural care, including pre-op teaching and completion of pre-op checklist according to hospital policy<br>• Ensures that physicians rounds are conducted by the staff nurse in order to communicate pertinent | 15% |

patient information
- Investigates and responds to complaints of patients, visitors, physicians and staff through own action or appropriate referral within 24 hours of receipt
- Interacts on a continuous basis with other departments by directing activities towards problem resolution

| | |
|---|---|
| 3.  STAFF COMPETENCY<br>• Assists the manager with monthly staff meetings and unit education for his/her shift and assists with the documentation of these activities according to policy<br>• Ensures staff participation in mandatory inservice programs as evidenced by employee records<br>• Ensures the staff receive proper orientation prior to assuming patient care responsibilities<br>• Confers with Manager and Preceptors on a weekly basis to monitor progress of new employees and provides written documentation if necessary<br>• Ensures documentation of required personnel records as defined by policy is in the employee files within two weeks for review date<br>• Performs employee evaluation within deadlines as assigned<br>• Utilizes evaluations as an effective management tool and holds subordinates accountable for responsibilities inherent in their position<br>• Ensures competency of personnel who float to other departments<br>• Ensures completion of agency nurse evaluations according to policy and within 24 hours of assigned shift<br>• Documents resource personnel on daily assignment sheet for orienteers and agency or SRP nurses | 15% |
| 4.  PERFORMANCE IMPROVEMENT PROGRAMS<br>• Assists in selecting performance improvement projects<br>• Participates in the evaluation of care, actions taken and effectiveness of the unit performance improvement processes<br>• Assists in collecting and analyzing data<br>• Participates on department/hospital performance improvement teams as requested | 10% |
| 5.  MANAGEMENT<br>• Conducts all aspects of supervision in a firm, fair and consistent manner as evidenced by employee documentation in employee files<br>• Works with staff to resolve interpersonal conflicts without the need to involve immediate supervisor<br>• Evaluates the morale of the staff and takes appropriate action to resolve problems<br>• Demonstrates the ability to identify and resolve problems, uses initiative and good judgment to reach quality decisions<br>• Administers nursing care according to all standards of performance for staff nurse II<br>• Serves as a clinical resource person and assists nursing personnel in assessing patient/family status to plan of care<br>• Assists in developing patient care standards and on-going review of policies and procedures for his/her unit<br>• Serves on committees or completes projects for department/unit as assigned | 25% |
| 6.  PROFESSIONALISM<br>• Displays professionalism through good work habits<br>• Attends 75% of the unit staff meetings<br>• Maintains competency in clinical practice through inservice and continuing education<br>• Participates in performance improvement unit projects including (identification of opportunities for improvement, plan for improvement, design to assess opportunity, initiation and study of data, actions to be implemented based on results)<br>• Demonstrates initiative in seeking out additional responsibilities<br>• Performs other duties as assigned | 10% |

Printed Name: _____        Employee's Signature: _____

Date: _____        Employee ID Number: _____

*A*

The employee's signature documents the opportunity to review and clarify the information outlined above.

| Job Description | |
|---|---|
| Original Creation Date | |
| Revision Dates | 8.15.2017 |
| Final Approver(s) | Downs, Stuart VP CNO |
| Date Approved | 8.15.2017 |
| Education Requirement | ASN/BSN |
| Certification Requirements | (no minimum certification required) |
| License Requirements | RN |
| Evidence-based Practice References | |

*This job description replaces all previous job descriptions for the same job code/job title.*

## INJURY/ILLNESS

**HISTORY:**

1. Is the condition due to an illness or an injury?   YES _✓_   NO _____
   *Please provide details of the illness/injury (if applicable):*
   _Left sided intracerebral hemorrhage_

2. Is the condition related to a previous injury or illness?   YES _____   NO _✓_
   *Please provide details of previous illness/injury (if applicable):*

3. Is the injury or illness the result of the team member's occupation at *WellStar Health System*?
   YES _____   NO _✓_

4. Date of the first office visit: _12/15/18_

**DIAGNOSIS:**

1. What is the diagnosis (including any complications): _Cerebral Hemorrhage,_
   _Hypertension_

2. Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
   YES _✓_ NO _____
   Dates of Admission: _12/2/18 - 12/7/18 @ Piedmont Atlanta_

3. Please indicate surgery/treatment dates: _See Above_

**PROGNOSIS:**

1. Is the patient totally disabled from his/her job?   YES _____   NO _✓_

2. Is the patient totally disabled from any other work?   YES _____   NO _✓_

3. Please indicate any limitations/restrictions: _____

4. What is the estimated date the team member can return to work? _01/07/19 -Week_

## AMOUNT OF LEAVE NEEDED

**CONTINUOUS:**

1. Will the team member be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?
   YES _✓_   NO _____

Revised: 10/14/2016

Estimated Beginning Date of Incapacity: **12/2/18**

Estimated End Date of Incapacity: **01/07/19**

**D**

## INTERMITTENT/REDUCED WORK SCHEDULE

1. Will the team member need to attend work intermittently or part-time/reduced schedule because of the team member's medical condition?

   YES _____   NO __✓__

   Estimated Beginning Date of Incapacity: _____

   Estimated End Date of Incapacity: _____

2. Are the treatments or the intermittent hours for work medically necessary?

   YES _____   NO _____

3. Estimate treatment schedule, if any, including dates of any scheduled appointments and the time required for each appointment, including recovery period:

   _____

   _____

4. Estimate the intermittent or part-time/reduced work schedule the team member needs, if any:

   **Hour(s) per Day** _____   **Day(s) per Week** _____   **Month(s)** _____

5. Will the condition cause episodic flare-ups periodically preventing the team member from performing his/her job functions?

   YES _____   NO _____

6. Is it medically necessary for the team member to be absent from work during the flare-ups?

   YES _____   NO _____

   *Please explain why:* _____

7. Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days).

   *Frequency:* _____ **Times per Week(s)** _____ for _____ **Month(s)**

   *Duration:* _____ **Hours** -or- _____ **Day(s) per Episode/Flare-up**

Dr. Paul King
**Printed Name of Healthcare Provider** _____

**Signature of Healthcare Provider** _____

**12/21/18**
Date

Revised: 10/14/2016

# Piedmont

Clifford, Destiny
MRN: 903936824, DOB: 3/10/1972, Sex: F
Adm: 12/2/2018, D/C: 12/7/2018

Discharge Summaries (continued)

Discharge Summaries by Sefanit G Gebretsadik, MD at 12/7/2018  9:02 AM (continued)

1. Unchanged left frontal lobe intraparenchymal hemorrhage measuring up to 4.5 x 3.4 x 2.6 cm in greatest dimension with surrounding vasogenic edema and mass effect upon adjacent structures causing a 2 mm of left-to-right midline shift at the level lateral ventricles. There is minimal extension of the hemorrhage into the left lateral ventricle frontal horn. There is no evidence of an arteriovenous malformation or cerebral aneurysm in the vicinity of this finding. No evidence of active arterial extravasation on this single phase CT examination.
2. A 1 mm cerebral aneurysm versus prominent infundibulum arising from the distal right internal carotid artery. There is no large vessel occlusion in the head. Approved By: James Berger  12/2/2018 6:28 PM



**DISCHARGE CONDITION:** good

**DISPOSITION:** home

**DISCHARGE INSTRUCTIONS**
MEDS:

### Home Medication Instructions

Clifford, Destiny
HAR:1020697730
Printed on:12/07/18 0903

| Medication Information | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| amLODIPine (NORVASC) 10 mg tablet<br>Take 1 tablet (10 mg total) by mouth daily. | | | | | | | | | |
| butalbital-acetaminophen-caffeine (FIORICET, ESGIC) 50-325-40 mg per tablet<br>Take 1 tablet by mouth every 6 (six) hours as needed for Headaches. | | | | | | | | | |
| cloNIDine (CATAPRES-TTS) 0.1 mg/24 hr patch<br>Place 1 patch onto the skin once a week. | | | | | | | | | |
| hydrALAZINE (APRESOLINE) 25 MG tablet<br>Take 3 tablets (75 mg total) by mouth 3 (three) times daily. | | | | | | | | | |
| levETIRAcetam (KEPPRA) 500 MG tablet<br>Take 1 tablet (500 mg total) by mouth 2 (two) times daily. | | | | | | | | | |

**Diet:** low fat
**Activity:** activity as tolerated
**Follow up with** Specialist
**Wound Care:** none needed

 **Piedmont**

Clifford, Destiny
MRN: 903936824, DOB: 3/10/1972, Sex: F
Adm: 12/2/2018, D/C: 12/7/2018

---

**Discharge Summaries (continued)**

Discharge Summaries by Sefanit G Gebretsadik, MD at 12/7/2018  9:02 AM (continued)



**PCP or Specialist notes for follow up care:**
Neurology

It took more than 35 minutes to prepare this discharge including planning with case management and discussing outpatient care plan with patient and family.


Sefanit G Gebretsadik, MD
12/7/2018
9:03 AM

Electronically signed by Sefanit G Gebretsadik, MD on 12/7/2018  4:09 PM

---



Wellstar AMC Neurosurgical & Spine Spec
285 Boulevard Ne Ste 415
Atlanta GA 30312-4210
Dept: 404-265-4400
Dept Fax: 404-265-4452

December 18, 2018

Destiny Clifford
3/10/1972

To whom it may concern,

Please excuse the absence of Ms. Clifford as she was seen in my clinic today. Ms. Clifford should remain off work until after she is seen in 6 weeks on January 29, 2019.  If additional information is required please contact our office.

Sincerely,

Paul K King, MD

Dept: 404-265-4400

The vision of WellStar Health System is to deliver world-class healthcare through our hospitals, physicians and services. Our not-for-profit health system includes WellStar Kennestone Regional Medical Center, WellStar Cobb, Douglas, Paulding and Windy Hill hospitals; WellStar Medical Group; Health Parks; Urgent Care Centers; Health Place; Homecare; Hospice: Atherton Place; Paulding Nursing Center; and WellStar Foundation. For more information, call 770-956-STAR or visit wellstar.com .

Destiny Clifford (MRN 564889262) DOB: 3/10/1972





## HEALTH RELEASE FORM

**TEAM MEMBER INFORMATION:**

| Name (Last, First, MI) | Team Member # | Org/Dept. |
|---|---|---|
| Clifford | 81009 | PACU. |

| Home Address (City, State, Zip) | Phone # | Manager's Name |
|---|---|---|
| 232 19th St NW Apt 7415 | (404) 936-2689 | Mgr. N. Thompso (Nerisa) |

**HEALTHCARE PROVIDER INFORMATION:**

| MD Name (Last, First, MI) | Phone # |
|---|---|
| Dr. Paul King | (404) 265-4400 |

| Home Address (City, State, Zip) | Email |
|---|---|
| 285 Boulevard NE Atlanta GA 30312  Suite 415 | |

1) Nature of illness/injury: **Intracerebral Hemorrhage**

2) Was this related to a previous illness/injury? **No**

   Details of previous illness/injury: **N/A**

   Was this related to work performed? **No**

3) Date team member may return to work? **01/07/19**

4) Medication currently prescribed: **Amlodipine, Fioricet, Clonidine Patch, Hydralazine, Keppra**

5) Restrictions (please be specific):

   **BACK**          No restrictions

   ☐ Sitting job only
   ☐ May stand/walk up to ___ hrs per day
   ☐ No lifting over _____ lbs
   ☐ No pushing/pulling greater than _____ lbs
   ☐ No prolonged sitting/standing/walking
      for more than _____ mins

   ☐ No prolonged / repeated
      bending at waist
   ☐ No prolonged/repeated
      kneeling/squatting
   ☐ No climbing ladders/stairs

   **Duration of Restriction:** _____

   **NECK**

   ☐ No constant neck flexion          ☐ No/limited overhead reaching

   **Duration of Restriction:** _____

   **UPPER EXTREMETIES**

   ☐ No use of:  Left / Right **ARM**     Left / Right **FINGER**     Left / Right **THUMB**
                 Left / Right **HAND**     Left / Right **WRIST**

Revised 5/3/2017

- ☐ No repetitive bending or twisting
- ☐ No/limited reaching above shoulder level

**Duration of Restriction:** _____

## LOWER EXTREMETIES

- ☐ Sitting job with foot/leg elevated
- ☐ Alternate sitting/standing, may walk short distances
- ☐ May walk/stand up to _____ hours per day
- ☐ No squatting/kneeling/climbing

**Duration of Restriction:** _____

## OTHER

- ☐ Employee limited to _____ hrs. per day
- ☐ No driving
- ☐ No use of hazardous machinery
- ☐ Other _____

**Duration of Restriction:** _____

**Healthcare Provider Signature:** *a.Vrieni, NR*    **Date:** 01/03/19

---

**NOTE: Department Manager must be able to accommodate any work restrictions noted before team member can be cleared to return to work.**

| Signature of Employee Health Nurse: | Date: |
|---|---|
| | |

*One copy to Benefit Representative, Employee Health and Department Manager*



Wellstar AMC Neurosurgical & Spine Spec
285 Boulevard Ne Ste 415
Atlanta GA 30312-4210
Dept: 404-265-4400
Dept Fax: 404-265-4452

January 3, 2019

Patient:     **Destiny Clifford**
Date of Birth: **3/10/1972**
Date of Visit: **1/3/2019**

To Whom It May Concern:

It is my medical opinion that Destiny Clifford may return to work on the week of
January 7, 2019.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Anita Virani, NP
Dr. Paul King MD

The vision of WellStar Health System is to deliver world-class healthcare through our hospitals, physicians and services. Our not-for-profit health system
includes WellStar Kennestone Regional Medical Center, WellStar Cobb, Douglas, Paulding and Windy Hill hospitals; WellStar Medical Group; Health Parks; Urgent
Care Centers; Health Place; Homecare; Hospice; Atherton Place; Paulding Nursing Center; and WellStar Foundation. For more information, call 770-956-STAR or
visit wellstar.org.

Destiny Clifford (MRN 564889262) DOB: 3/10/1972



**WellStar Atlanta Medical Center Neurosurgical & Spine Speci**
285 Boulevard Ne Ste 415
Atlanta GA 30312-4210
Dept: 404-265-4400
Dept Fax: 404-265-4452

G

January 29, 2019

Patient:   **Destiny Clifford**
Date of Birth: **3/10/1972**
Date of Visit: **1/29/2019**

To Whom It May Concern:

It is my medical opinion that Destiny Clifford may return to full duty immediately with the following restrictions: no night call for two months. We will reevaluate her at that time.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

*A. Virani*
Anita Virani, NP
Dr. Paul King MD

The vision of WellStar Health System is to deliver world-class healthcare through our hospitals, physicians and services. Our not-for-profit health system includes WellStar Kennestone Regional Medical Center, WellStar Cobb, Douglas, Paulding and Windy Hill hospitals; WellStar Medical Group; Health Parks; Urgent Care Centers; Health Place; Homecare; Hospice; Atherton Place; Paulding Nursing Center; and WellStar Foundation. For more information, call 770-956-STAR or visit wellstar.org.

Destiny Clifford (MRN 564889262) DOB: 3/10/1972

Position schedule table (rotated), largely illegible. Partial reading below.

| Name / Position | | |
|---|---|---|
| Destiny Clifford | | |
| Annie Varghese | | |
| Jennifer Jean-Paul | | |
| Gloria Ratliff | | |
| Laquanta Russell | | |
| Heather Hunningham | | |
| Aysha | | |
| James Xin | | |
| Tika Allen | | |
| Nicole F- Freckleton | | |
| Catherine Hendricks | | |
| Travenna Saunders | | |
| Arcadia Scott | | |
| Christina Medley | | |
| **Night** | | |
| Donna Curtis | | |
| Deborah Spurr | | |
| **CALL** | | |
| Destiny Clifford | | |
| Jennifer J-Paul | | |
| Gloria Ratliff | | |
| Laquanta Russell | | |

Legend:
- Charge
- C1: Back up call 1
- C2: back up call 2
- O- orientation
- P= Preceptor
- A – am call
- P – evening call
- C- CALL

TOTAL COUNT



## RIGHT FOR AN ACCOMMODATION:



Public **Accommodations** at the Federal Level
Through the Civil **Rights Act** of 1964 and the Americans with
Disabilities **Act** (ADA), the federal government prohibits discrimination in
public **accommodations** on the basis of the following: race, color, religion,
national origin, and disability.





Narissa Thompson ›

Sun, Feb 10, 6:44 PM



Against medical advice I will be in. I will get documents signed tomorrow from doctors office. Apparently my health is not being considered. This is the doctors order.



**Health System**





<u>Sent via email and USPS</u>

February 5, 2019

Destiny Clifford
232 19th Street NW Apt 7415
Atlanta, GA 30363

Dear Team Member:

The Benefits Department has been notified of your request for an accommodation.  Your doctor's note dated 1/29/2018 states the following restriction: no night call for 2 months.   Based on the information provided, I need to have an updated Health Release form.  Please have your doctor update the form as instructed and return to me.

I need to have the form returned by February 15, 2019 to review your request for accommodation.

If you have any questions, please feel free to contact me.

Thank You

LaTonya Woods

WellStar Health System
Human Resources: Benefits Office
Attention: LaTonya Burtwell Woods
303 Parkway Drive NE
Atlanta, GA  30312
Latonya.burtwellwoods@wellstar.org
Phone: 404-265-3396
Fax: 770-999-2531





# HEALTH RELEASE FORM

## TEAM MEMBER INFORMATION:

| Name (Last, First, MI) | Team Member # | Org/Dept. |
|---|---|---|
| Clifford, Destiny A | 81009 | Nursing - PACU |
| **Home Address (City, State, Zip)** 264 19th St Atlanta, GA  30363 | **Phone #** 404-936-2689 | **Manager's Name** Nerissa Thompson |

## HEALTHCARE PROVIDER INFORMATION:

| MD Name (Last, First, MI) | Phone # |
|---|---|
| Paul King | (404) 265-4400 |
| **Home Address (City, State, Zip)** 285 Boulevard NE Suite 415 Atlanta, GA 30312 | **Email** |

1) Nature of illness/injury: __Intracerebral Hemorrhage__

2) Was this related to a previous illness/injury? __No__

   Details of previous illness/injury: __N/A__

   Was this related to work performed? __No__

3) Date team member may return to work? __Returned week of January 7, 2019__

4) Medication currently prescribed: __Keppra, Amlodipine, Hydralazine, Clonidine__

5) Restrictions (please be specific):

### BACK

☐ Sitting job only
☐ May stand/walk up to ___ hrs per day
☐ No lifting over _____ lbs
☐ No pushing/pulling greater than _____ lbs
☐ No prolonged sitting/standing/walking
   for more than _____ mins

☐ No prolonged / repeated
   bending at waist
☐ No prolonged/repeated
   kneeling/squatting
☐ No climbing ladders/stairs

N/A

**Duration of Restriction:** _____

### NECK

☐ No constant neck flexion          ☐ No/limited overhead reaching

**Duration of Restriction:** _____ N/A _____

### UPPER EXTREMETIES

☐ No use of:  Left / Right **ARM**      Left / Right **FINGER**      Left / Right **THUMB**

Left / Right **HAND**      Left / Right **WRIST**

N/A

Revised 5/3/2017

☐ No repetitive bending or twisting
☐ No/limited reaching above shoulder level

**Duration of Restriction:** _____

## LOWER EXTREMETIES

☐   Sitting job with foot/leg elevated
☐   Alternate sitting/standing, may walk short distances
☐   May walk/stand up to _____ hours per day
☐   No squatting/kneeling/climbing          N|A

**Duration of Restriction:** _____

## OTHER

☐   Employee limited to _____ hrs. per day          ☐ No use of hazardous machinery
☐   No driving                                       ☑ Other  No night call for 3 months

**Duration of Restriction:**  3 months

**Healthcare Provider Signature:** _____        **Date:** 2/12/19

┌─────────────────────────────────────────────────────────────────────────────┐

**NOTE:  Department Manager must be able to accommodate any work restrictions noted before team
member can be cleared to return to work.**

| Signature of Employee Health Nurse: | Date: |
|---|---|
|  |  |

*One copy to Benefit Representative, Employee Health and Department Manager*

**Fwd: Restrictions**

**Destiny Clifford** <clifford.destiny@yahoo.com>
Thu 4/30/2020 3:47 PM
To: ODS02538CPC <ODS02538CPC@OfficeDepot.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** April 29, 2020 at 11:46:03 AM EDT
> **To:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Subject: Re: Restrictions**

On Wednesday, February 20, 2019, 10:06:12 AM EST, Burtwell Woods, LaTonya J <latonya.burtwellwoods@wellstar.org> wrote:

Hi Destiny

Can you have your doctor fax me a note or email as to why you cannot take night call? I know we had this discussion about your medications and I did speak with your doctor's office, however, I need to have this documentation as part of your leave file for the accommodation request.   Let me know if you have any questions.

Thanks

LaTonya Burtwell Woods

**Benefits Analyst  - AMC / AMC South Campuses**

WellStar Atlanta Medical Center

Human Resources - Benefits Department

303 Parkway Drive NE, Atlanta, GA 30312

Phone: (404) 265-3396

Fax: (770) 559-2531

BENEFITS COMMUNICATION SUPPORT LINE: 1-888-926-2992/Mon-Fri 8a-5p



WellStar Atlanta Medical Center Neurosurgical &
Spine Specialist
285 Boulevard Ne Ste 415
Atlanta GA 30312-4210
Dept: 404-265-4400
Dept Fax: 404-265-4452



February 27, 2019

To Whom It May Concern,

Destiny Clifford (DOB 03/10/72) is currently under the care of Dr. Paul King for a hypertensive hemorrhage. She has been prescribed medications which will cause drowsiness. She has been cleared to return to work with the following restrictions: No night call for 3 months due to side effect profile of medications. We will reevaluate her at that time. If you have any questions or concerns please contact the office.

Thank you,

Anita Virani, NP-C
Dr. Paul King

The vision of WellStar Health System is to deliver world-class healthcare through our hospitals, physicians and services. Our not-for-profit health system includes WellStar Kennestone Regional Medical Center, WellStar Cobb, Douglas, Paulding and Windy Hill hospitals; WellStar Medical Group; Health Parks; Urgent Care Centers; Health Place; Homecare; Hospice; Atherton Place; Paulding Nursing Center; and WellStar Foundation. For more information, call 770-956-STAR or visit wellstar.org.

Destiny Clifford (MRN 564889262) DOB: 3/10/1972

2/21/19

Donna Riley. — Missing On Q ball?

Nerrisa Thompson + Vangie
Dennis state that I charted,
on this patient and did not
place the OnQ ball on
the patient However I do
not recall patient situation.
However willing to be more
Cone. Thanks.

Destiny Clifford  RN BSN
Heparin Issue
@ 1304L
- OR Brought Pt to PACU & started Heparin
- Pt was transported to 5th floor.
- Pt was off pump < 2 mins.
  Nurse Romwell and New nurse
  entered the room with me.
- Heparin Check off was initiated at Bedside
  Pt. was off pump ≥ 2 mins and nurse
  immediately informed, She immediately
  grabbed pump and ~~pla~~ patient was
  placed on IV Pump.

Immediately Charge nurse called stating
that Nurse said I didn't want to
wait for a pump. However the Heparin
Bedside report could not have ~~be~~ taken
place w/o all devices in place.

Spoke with Charge nurse immediately
and she said everything was okay.
and wanted to know if he did
hand off.

**WELLSTAR**



| CONTINUOUS IV HEPARIN THERAPY PROCEDURE | | | |
|---|---|---|---|
| Policy/ Procedure # | MU-70-01 | Effective Date | March 2018 |
| Category | Standard | Last Review/Revision | November 2017 |
| Sub-Category | Medication Use | Standards Leader | VP Pharmacy Services |

**PURPOSE:** To define a process for the safe administration and monitoring of IV heparin to patients 18 years of age or older.

**DEFINITION(S):**
**Antifactor Xa (Anti-Xa) – A** lab test used to monitor unfractionated heparin therapy
**CBC** - Complete blood count, details platelet count, hemoglobin, and hematocrit, among other blood components.
**DVT** – Deep Vein Thrombosis
**EID** - Electronic Infusion Device
**High Dose Heparin** – Refers to the weight-based intravenous heparin orders indicated for Deep Vein Thrombosis (DVT), Pulmonary Embolism (PE), or Atrial, Arterial, or Ventricular Thrombosis.
**HIT** - Heparin induced thrombocytopenia (with or without thrombosis), marked by a ≥ 50% decline in platelets typically seen within four (4) to ten (10) days of heparin exposure. Patients with confirmed HIT should not be administered heparin.
**INR** - International Normalized Ratio, a value that mathematically converts Prothrombin Time (PT) to an internationally recognized standard for monitoring warfarin therapy.
**Low Dose Heparin** – Refers to the weight-based intravenous heparin orders indicated for Acute Coronary Syndrome, Atrial Fibrillation, and Mechanical Heart Valves.
**Neurology Dose Heparin** – Refers to the weight-based intravenous heparin orders indicated for Ischemic Stroke
**PE** - Pulmonary Embolus
**PT** – Prothrombin Time
**PTT** - Partial Thromboplastin Time, a test used to monitor unfractionated heparin and intravenous direct thrombin inhibitor therapy.
**Registered Nurse (RN)** - A registered nurse with an active license to practice nursing issued by the Georgia Board of Nursing.
**VTE** – Venous thromboembolism

**EXCEPTIONS:** This policy excludes the continuous heparin drip for post-thrombolysis.

**HOSPITAL VARIATION:**   ☐ CH      ☐ DH      ☐ KH      ☐ PH      ☒ WHH
**LOCATION IN PROCEDURE:** 2.1, SUPPLEMENTAL GUIDANCE

**PROCEDURE:**

| Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|
| **INITIAL ASSESSMENT** | | |
| 1.1  Obtain baseline laboratory tests prior to initiating heparin | Phlebotomist or RN | Baseline laboratory tests include<br>♦   PT/INRCBC<br>♦ |
| 1.2  Weigh the patient on the scale | RN | Do not accept the patient's stated weight |
| 1.3  Notify prescriber prior to initiating heparin if allergy to heparin or heparin-induced thrombocytopenia (HIT) is documented | RN | |

*MU-70-01 Heparin Therapy*



| Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|
| CAUTION: Neurology Dose Heparin. Do not initiate heparin therapy until the prescriber has been notified of any abnormal baseline laboratory values. | | |
| NOTE: High- and Low-Dose Heparin. Heparin therapy may be initiated prior to the receipt of baseline laboratory results unless otherwise directed by the prescriber. | | |
| 1.4 Review baseline labs and notify prescriber of abnormal lab results. Note: If platelets are between 50-100,000/mm³ or greater than 50% decline seen, notify physician; continue to administer heparin unless new orders are received from physician or if signs of bleeding noted. If platelets fall below 50,000/mm³ with or without greater than 50% decline seen, hold heparin product and notify physician. | RN | Abnormal baseline laboratory results include:<br>♦ INR greater than or equal to 2<br>♦ Platelet count less than 100,000/ mm³<br>♦ PTT greater than 40 seconds<br>♦ Hemoglobin less than 7 g/dL |
| 1.5 Discontinue subcutaneous heparin, oral anticoagulants, or other parenteral anticoagulants the patient is currently receiving | Prescriber or Pharmacist | Subcutaneous heparin or other parenteral anticoagulants include:<br>♦ low-molecular weight heparin (e.g., enoxaparin)<br>♦ fondaparinux (Arixtra®)<br>♦ direct thrombin inhibitors (e.g., bivalirudin, argatroban)<br>Oral anticoagulants include:<br>♦ apixaban (Eliquis®)<br>♦ dabigatran (Pradaxa®)<br>♦ rivaroxaban (Xarelto®) |
| NOTE: It is acceptable for a patient to receive IV heparin and warfarin (e.g., Coumadin®) and/or IV heparin and antiplatelets concurrently. | | |
| 1.6 Discontinue intramuscular (IM) injections | Prescriber | ♦ Do not discontinue IM vaccines (influenza and pneumococcal) |
| INITIATION AND ADMINISTRATION OF INFUSION | | |
| 2.1 Order appropriate indication-specific heparin infusion | Prescriber | ♦ Prescriber specifies in Epic orders in Epic the indication-specific  Heparin infusion:<br>✓ Low Dose Heparin<br>✓ High Dose Heparin<br>✓ Neurology Dose Heparin (WHH LTAC: no Neurology Dose Heparin orders)<br>♦ Order set must be used.<br>♦ For High- and Low-Dose Heparin, prescriber must indicate whether heparin IV should be held for resulted baseline lab results. |
| | | ♦ |
| | | ♦ |
| CAUTION: Heparin should not be administered to patients with confirmed allergy to heparin or history of HIT (with or without thrombosis). Evaluate patients chart for documentation of either prior to ordering heparin. | | |
| 2.2 Use documented actual weight when prescribing heparin. | Prescriber | ♦ The heparin dose is based on the weight per scale at the time of the initial order unless otherwise requested. Use the weight obtained at the initiation of the infusion for all subsequent calculations. |

Vertical labels: STEP ONE, STEP TWO

Aug/1/2019 4:36:31 PM          Atlanta Medical Center 4042653991                    7/10



| Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|
| 2.3 Calculate initial heparin bolus dose based on Actual Patient Weight (unless specified as No bolus) | Prescriber | • Utilize Epic order set for calculation of initial IV bolus using actual patient weight, up to the maximum dose. |
| 2.4 Administer the initial heparin bolus per the prescriber's order | RN | • High dose heparin: Initial bolus initial bolus is 80 units/kg (not exceeding *10,000 units*)<br>• Low Dose Heparin: Initial bolus is 60 units/kg (not exceeding 4,000 units for patients who have already received thrombolytics or 5,000 units for patients who have not received thrombolytics)<br>• Neurology: By default, there are no bolus orders in the neurology dose heparin orders. Any boluses, initial or subsequent, are ordered at the discretion of the prescriber |
| 2.5 Administer heparin infusion as a primary infusion through a dedicated IV line with a dedicated infusion device | RN | • When venous access is limited, compatible solutions may be given via the same IV site with the heparin infusion, keeping the heparin infusion on a dedicated IV line with a dedicated infusion device |
| 2.6 Administer the initial heparin infusion per the prescriber's order | RN | • Infusion pump is programmed for the ordered initial infusion dose in units/kg/hr using the weight included on the order.<br>• Initial doses are capped based on a unit/hr max<br>  o Low Dose & Neurology Dose = 1,000 units/hr<br>  o High Dose = 2,250 units/hr<br>• To achieve the appropriate dose cap, Epic will round the unit/kg/hr dose so as not to exceed these max doses.<br>• |

**CAUTION:**
• Use an EID to administer continuous heparin infusions.
• Verify drug, dose, route of administration, and infusion rate with RN/RN prior to administration, each time a new heparin bag is hung, and with all heparin dose changes.
• Pump settings are verified with another nurse at the patient's bedside.
• Verification co-signatures, by the two nurses participating in the verification process, are required in the patient's medical record (Epic).

| 2.7 Verify, document, and sign-off on all heparin infusion doses, including changes in Epic. Dual verification with another RN required. | RN | • Heparin infusion dose changes requiring documentation include:<br>• Initial bolus and infusion rate<br>• subsequent boluses<br>• Infusion dose adjustments |
| 2.8 Label IV heparin tubing | RN | |
| 2.9 Educate patient/family upon initiation of IV heparin therapy | RN | Education includes:<br>• Potential for adverse drug reactions and interactions<br>• Major side effects with a particular emphasis on bleeding precautions |

*CONTINUED MONITORING OF INFUSION*
**CAUTION:** At any time during the infusion, discontinue the heparin infusion immediately and alert the prescriber if the patient experiences adverse effects such as:
• Change in level of consciousness or headache
• Bleeding as evidenced by bruising; evidence of blood in the stool, urine, sputum and/or gums; gastrointestinal bleeding; prolonged or spontaneous bleeding from an intravascular access site Hypersensitivity reaction



| Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|
| 3.1 Obtain anti-Xa level six (6) hours after the initiation of IV heparin therapy, and then follow instructions included in the heparin dose adjustment nomogram. | RN | ♦ |
| 3.2 | RN | ♦ |
| 3.3 Use Anti Xa level to adjust heparin infusion doses per the heparin dose nomogram | RN | |
| 3.4 Obtain Anti Xa level daily once the desired Anti Xa value is achieved | RN | |
| 3.5 Document all adjustments to heparin therapy in Epic | RN | Document all infusion doses in units/kg/hr |
| 3.6 Obtain a CBC with platelet count at least every other day while patient is receiving heparin | RN | ♦ Review platelet count Monitor hemoglobin (Hgb) and hematocrit (Hct) to assess for decline |
| 3.7 Review INR, if available, and especially for patients on concomitant warfarin therapy | RN | Notify prescriber of INR greater than 2 (or lowest range of therapeutic INR goal) |
| 3.8 Discontinue heparin used as bridge therapy for warfarin once INR is within therapeutic range | Prescriber or Pharmacist | Parenteral anticoagulation used as bridge therapy with warfarin can be discontinued by the prescriber or pharmacist when INR is within therapeutic range. ♦ For the treatment of DVT or PE with warfarin, bridge therapy with a parenteral anticoagulant is required for a minimum of five (5) days and until the INR is within therapeutic range of 2 to 3 for 24 hr on two (2) consecutive INR values prior to discontinuation. For the treatment of DVT or PE with warfarin, bridge therapy with a parenteral anticoagulant may be discontinued for supratherapeutic INR prior to completion of five (5) days concomitant warfarin therapy. |
| 3.9 Discontinue heparin if other therapeutic anticoagulants initiated | Prescriber or Pharmacist | This applies to patients on warfarin with a therapeutic INR or other therapeutic doses of oral or parenteral anticoagulants |

CAUTION: Notify prescriber of the following unless otherwise directed:
- Anti-Xa result greater than 2.
- Two consecutive anti-Xa results. Prior to contacting the prescriber, stop the infusion.
- Two consecutive Anti-Xa values below 0.1 in patients on the Neurology CPG Dose or patients diagnosed with PE or suspected PE.
- Platelets below 100,000/ mm³ or greater than 50% decline in baseline platelet count. Continue to administer heparin.
- Platelets below 50,000/mm³ with or without a greater than 50% decline in baseline platelet count. Hold heparin. Hemoglobin < 7 g/dL or decline of ≥ 2 g/dL

NOTE: If infusion has been interrupted for more than ninety (90) minutes, consult the prescriber to determine if an additional bolus is required.



| Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|
| 3.10 Assess vital signs and signs of bleeding every eight (8) hours during IV heparin therapy | RN | Assessment includes:<br>• headache<br>• changes in level of consciousness<br>• hematuria<br>• hemoptysis<br>• hematemesis<br>• melena<br>• tarry stools<br>• petechiae<br>• bruising<br>• nosebleeds<br>• changes in menstrual blood flow<br>nausea and vomiting |
| 3.11 When a patient is temporarily transported off the unit (with the heparin infusion continuing), upon the patient's return:<br>• Verify the time of return<br>• Amount infused<br>• Document in Epic | RN | |
| NOTE: Consult the prescriber for guidelines to discontinue/resume the heparin infusion when patient is scheduled to undergo an invasive procedure. | | |
| 3.12 Upon removal of IV catheters apply direct pressure to:<br>• Venous puncture site for *a minimum of five (5) minutes*<br>• Arterial puncture site for a minimum of fifteen (15) minutes<br>• Or until hemostasis is achieved | RN | • A dry sterile bandage should be applied to the site |



| | Required Action Steps | Performed By | Supplemental Guidance |
|---|---|---|---|
| | 3.1 Discontinue heparin if other therapeutic anticoagulants initiated | Prescriber or Pharmacist | • This applies to patients on warfarin with a therapeutic INR or other therapeutic doses of oral or parenteral anticoagulants |
| STEP THREE CONT. | CAUTION: Notify prescriber of the following unless otherwise directed:<br>• Anti-Xa result greater than 2.<br>• Two consecutive Anti-Xa results. Prior to contacting the prescriber, stop the infusion.<br>• Two consecutive Anti-Xa values below 0.1 in patients on the Neurology Dose or patients diagnosed with PE or suspected PE.<br>• When PTT results are not clear, as reported by Lab<br>• Platelets below 100,000/ mm³ or greater than 50% decline in baseline platelet count. Continue to administer heparin.<br>• Platelets below 50,000/mm³ with or without a greater than 50% decline in baseline platelet count. Hold heparin.<br>• Hemoglobin < 7 g/dL or decline of ≥ 2 g/dL. | | |
| | NOTE: If infusion has been interrupted for more than ninety (90) minutes, consult the prescriber to determine if an additional bolus is required. | | |



| | | | |
|---|---|---|---|
| 3.2 | Assess vital signs and signs of bleeding every eight (8) hours during IV heparin therapy | RN | Assessment includes:<br>• headache<br>• changes in level of consciousness<br>• hematuria<br>• hemoptysis<br>• hematemesis<br>• melena<br>• tarry stools<br>• petechiae<br>• bruising<br>• nosebleeds<br>• changes in menstrual blood flow<br>• nausea and vomiting |
| 3.3 | When a patient is temporarily transported off the unit (with the heparin infusion continuing), upon the patient's return<br>• verify the time of return<br>• amount infused<br>• document in Epic | RN | |
| NOTE: Consult the prescriber for guidelines to discontinue/resume the heparin infusion when patient is scheduled to undergo an invasive procedure | | | |
| 3.4 | Upon removal of IV catheters apply direct pressure to:<br>• venous puncture site for a minimum of five (5) minutes<br>• arterial puncture site for a minimum of fifteen (15) minutes<br>• or until hemostasis is achieved | RN | • A dry sterile bandage should be applied to the site |

| RELATED DOCUMENTS | | |
|---|---|---|
| Policy / Procedure | MU-70 Anticoagulation Therapy | |
| Job Aids | MU-70 Job Aid 1 Guidelines for Epidural Removal in Anticoagulated Patient | |
| Related Medical Record Form(s) | | Form/Item # |
| | | |
| | | |
| | | |
| Regulatory Requirements | TJC National Patient Safety Goal 03 05.01 | |
| Evidence Based Practice References | Garcia DA, et al. Parenteral Anticoagulants: Antithrombotic Therapy and Prevention of Thrombosis, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. *Chest.* 2012:141(2 Suppl):e24S-43S.<br><br>Ageno W, et al. Oral anticoagulant Therapy: Antithrombotic Therapy and Prevention of Thrombosis, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines. *Chest.* 2012:141(2 Suppl):e44S-e88S. | |

*This replaces all previous [SPP/APP/DPP] MU-70-01 and all previous [SPP/APP/DPP] MU-70-01 shall automatically terminate upon the effective date set forth above.*

NO POLICIES & PROCEDURES



**Phone screenshot header:**
T-Mobile LTE   11:06 AM   27%
Touch to return to call 20:05

< 1

N

Narissa Thompson >

Ok since we never had any official daily operations manual I will document what I initiated and I've already reached out to Cobb that AMC is part of a standardized process

I have no problem reaching out to Sherry. I'm sure she has something in place.

**Didn't Kristina say that the standardization process is on hold?**

I'm not talking about policies and procedures. I'm already on the team with Weslie when that begins. I'm talking about daily process. Because I don't want to miss anything significant that I was not informed about. Because my process was being done based on my own experience.

That is why I've built a relationship

iMessage

**Handwritten annotations:**
- Clinical Coordinator — Destiny
- Clinical Coor. — Destiny
- The OR Educator
- Kristina is Education Nurse } The OR Educator
- Destiny (CCN)
- (PACU Manager) Narissa Thompson
- Corporate Dr. Weslie DPP



## Destiny Clifford 81009

From:   Destiny Clifford (clifford.destiny@yahoo.com)

To:     sharon.boston@wellstar.org

Date:   Thursday, March 7, 2019, 3:51 PM EST

Dear Sharon Boston,

I would like to express my concerns of retaliation with you immediately regarding surgical management. I have report management previously and believe that theses measure are harassment measures and wish to discuss them with Human Resources. Since this occurrence I have been highly stressed and feel that a hostile work environment has been created for me. I have called my physician to move my doctor's appointment up immediately for I am feeling highly stressed regarding how I am being treated in my department by management. I tried to keep quiet about it because the last time I made a report management told me that I went low. So please allow time for a clear understanding as to what is actually taking place. Thank you.

Destiny Clifford
404.936.2689
clifford.destiny@yahoo.com

## Fwd: Administrative Leave Investigation employee 81009

Destiny Clifford <clifford.destiny@yahoo.com>
Thu 4/30/2020 3:48 PM
**To:** ODS02538CPC <ODS02538CPC@OfficeDepot.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** April 29, 2020 at 11:47:39 AM EDT
> **To:** "Clifford.destiny@yahoo.com" <clifford.destiny@yahoo.com>
> **Subject: Re: Administrative Leave Investigation employee 81009**

On Tuesday, May 28, 2019, 11:58:14 AM EDT, Destiny Clifford <clifford.destiny@yahoo.com> wrote:

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** March 7, 2019 at 9:11:12 AM EST
> **To:** Sharon.Boston@wellstar.irg
> **Subject: Administrative Leave Investigation employee 81009**

Hello Ms Sharon!


This is Destiny Clifford RN BSN (PACU Coordinator). I will be sending you a complete affidavit of facts regard both medication error in full detail to assist you for a full investigation.


Ms Boston please can you provide me the policy regarding Wellstar's Atlanta Medical full details for why an employee would be placed on Administrative Leave because no documentation or written documentation was provided for me after my removal from the department on March 6, 2019 with Vangie Dennis and Nerissa Thompson.


Ms Boston I am still unclear of the reason why such measure has been taken as to remove me from work. What is the exact cause? As a Clinical Coordinator working with management to stabilize and educate the department we have never removed any individual for a medication error. Especially if there was no adverse medication reaction or injury to a patient.


I am thankful that an investigation is taking place to increase best practices but I feel that I am being targeted. I just had a hemorrhagic stroke on December 2, 2019 and was hospitalized in Critical Care.  I returned to work early to assist with the demands of the department. But upon my return my neurosurgeon gave me a restriction that at this moment I do not take night call because of my need to adjust to the various

 medications. Since my return and the presenting of my restriction management has not communicated with me unless it is to reprimand me. I have returned to work for 2 months now and have only been approached for what looks like a dismissal.

 There has been another incident where I reported to HR how I was being treated by surgical management. I even applied to Labor and Delivery to remove myself from the department based on unfair treatment. It seems that I am witnessing an unfair hand of treatment and wish to speak further about this matter.



 With my return to work there was a slight adjustment back to the department but I have been a nurse nearly 20 years and the adjusts were minimal. However I was told by management that the entire depart was unhappy with my leadership but no facts were presented just generalized statements. I even asked that we have an meeting to address actual and factual concerns that each problem be addressed but the offer was denied. So O volunteered to step down from the position if my job performance was insufficient but they insisted that I should not step down.

 I have been back to work for a total of 2 months and management has refused to discuss any leadership plans or have me operate in any copacity of the Clinical Coordinator which concerns me regarding treatment.

 It has been a drastic change in behavior against me regarding management since my return to work. The PACU department requires extensive call. So if i'm not taking night call I know it can be frustrating to management but I have a health condition. I talk with Nerissa and requested to do weekend day call but she said we will no longer have day call. I just wanted to continue to work. And to work safely without issue.

 Ms Boston this matter goes much deeper than a medication error. And please in your investigation regard the patients missing Q-ball. Nurse Annie V. RN a nurse in PACU placed my medication in some cabinet i. the nurses station along with other Q-balls for pending surgical patient scheduled to arrive. I never touched the medication. I was transporting patients and all within the busy day I returned to the floor and transported my patient to their primary nurse leaving themecicstiln behind.

 Ms Boston I will forward you my complete statements for a good investigation. God bless. Talk witn you soon. Hope all matters are reconciled and all matters are addressed for a clear view.

I will email you the affidavit of facts asap!
And I would like to set an appointment to discuss my concerns.

DESTINY CLIFFORD
404.936.2789
clifford.dedtiny@yahoo.com


Sent from my iPhone

Yahoo Mail - RE: [**WARNING** EXTERNAL MAIL] No Response Given

# RE: [**WARNING** EXTERNAL MAIL] No Response Given

**From:** Boston, Sharon (sharon.boston@wellstar.org)

**To:** clifford.destiny@yahoo.com

**Date:** Thursday, July 11, 2019, 11:52 AM EDT

Good Morning Destiny,

Vangie has made me aware that she has been trying to get ahold of you via phone and text to schedule a meeting with you for this Friday to discuss the results of the investigation. Vangie explained that she has been unable to leave a voicemail for you because your voicemail is full and that you have not responded to her text messages.

I wanted to make you aware that it is OK for you to respond to her request to meet with you. It is imperative that you do so today.
Please either respond to the text message that she previously sent to you or call her directly on 404-805-1487.

Regards,
Sharon

-----Original Message-----
From: Destiny Clifford [mailto:
Sent: Wednesday, July 10, 2019 7:24 PM
To: Boston, Sharon
Subject: [**WARNING** EXTERNAL MAIL] No Response Given



Hello Sharon Boston,

I have been off of work for 5 months regarding an alleged medication error where no documentation has ever been presented or any questions or emails sent to me in any form since March 6, 2019 the day you released me on Administrative Leave.

WELLSTAR or any employee associated with Wellstar has NEVER presented me with any proof of accusation. For the record I have been away from my job for a substantial amount of time which is very humiliating regarding this matter. No one has even addressed my concerns of harassment and this is another form of their harassment.

I have recorded conversations and
written documention of every conversation to support my claims for further legal action.

Wednesday I received a call from Vangie Dennis stating that she and Nerissa wants to meet with me and discuss the results of the investigation; however it was made clear to me by you that I am not to communicate with hospital staff since legal is involved. However that does not mean that you totally ignore all of my initial request regarding documentation, Complaints, Policies and even a meeting with HR to verbalize my harassment concerns.

As Human Resourse Representative you have failed to show ANY CONCERN! As an employee I feel that the system has abused me. Please provide all documented proof in written form

Wellstar Atlanta Medical policy regarding Administrative Leave at the time of my dismissal.

bout:blank

Give details as to why Atlanta Medical went to the far extreme to exercise the Administrative Leave policy against me.

March 8, 2018 I visited the hospital and it was reported that there was no Administrative Leave Policy. Erika Bickerstaff was called but no return call was given.

For the record please show me the detailed  facts regarding this case. If the facts are NOT presented this cased will be filed immediately without hesitation. This is sad and outrageous and no nurse should be treated this unfairly. This is clearly an act of retaliation.

Sent from my iPhone

_____

This email and any files transmitted with it may contain confidential and /or proprietary information in the possession of WellStar Health System, Inc. ("WellStar") and is intended only for the individual or entity to whom addressed. This email may contain information that is held to be privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized access, dissemination, distribution or copying of any information from this email is strictly prohibited, and may subject you to criminal and/or civil liability. If you have received this email in error, please notify the sender by reply email and then delete this email and its attachments from your computer. - Thank you.

5/16/21, 11:08 PM

## Fwd: Legal Request of Harassment Documentation



From:  Destiny Clifford (clifford.destiny@yahoo.com)

To:    Clifford.destiny@yahoo.com

Date:  Wednesday, July 10, 2019, 8:56 PM EDT

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <             >
> **Date:** July 10, 2019 at 8:06:17 PM EDT
> **To:** "            " <           >
> **Subject: Legal Request of Harassment Documentation**

Sharon Boston & Erika Hickman

Please provide Erika Hickman (Wellstar Legal Rep) a copy of my filed complaints when Ms Quanta was the representative for the Surgical Department. It was also carbon copied to Vangie Dennis and Nerissa Thompson. They are requesting documentation in which you have not provided. I sent it to them and it is with Human Resources and Management. There seems to be a miscommunication.

ATTENTION:
What are your plans? This matter has escalated and I am ready to move forward. I have recorded conversations and statements to back my claims and since my current claim has NOT been acknowledged by the legal department I have no other choice but to file with the EEOC.

In addition, after returning back to work in 8 weeks I have been targeted since my return from medical leave after my stroke I was treated differently regarding my resent disability. Nerissa treated me with the inability to perform as she withheld all my leadership responsibilities and placing me in a lower position because she believed that I did not need to continue my assigned job after having a stroke. Basically after refusing to communicate with me she demoted me which was my prior complaint from my leadership position and removed from all managerial responsibilities. Since my return back to work Nerissa states that  I did not understand how the unit operates and that since  the doctor placed me on a work accommodation that maybe I should have stayed home because of my illness. However at her request I created the PACU department manual in which the department operates at the time of her being hired into her new position as Manager.

I have never been approached or written up by any management that I am not a high achiever or informed that I lacked any managerial skill.

I have been targeted regarding my medical condition and restriction for night call regarding my inability to stay cognizant after work hours due the the strong medications I was prescribed to prevent another hemorrhagic stroke. Management was very upset because Vangie says that she is not paying

Nerissa to take call. Nerissa tells me that she finds it hard to believe that I even had a stroke and treated me very unfairly as if I was lying to her.

Management was very upset with me after my illness that they found a way to dismiss me by discrimination,harassment, targeting,retaliation and false representation. They created a hostile work environment for me as they striped and undermined my leadership.

PURSUANT TO EEOC POLICY:

For example, depending on the facts, it could be retaliation if an employer acts because of the employee's EEO activity to:

- reprimand the employee or give a performance evaluation that is lower than it should be;

- transfer the employee to a less desirable position;

- make the person's work more difficult (for example, punishing an employee for an EEO complaint by purposefully changing his work schedule to conflict with family responsibilities).

Link: https://www.eeoc.gov

Sent from my iPhone



Yahoo Mail – Fwd: Letter of harassment/Administrative Leave Destiny Clifford 81009                                    5/16/21, 10:19 PM

## Fwd: Letter of harassment/Administrative Leave Destiny Clifford 81009

From:  Destiny Clifford (clifford.destiny@yahoo.com)

To:     Clifford.destiny@yahoo.com

Date:  Tuesday, May 11, 2021, 1:23 AM EDT



Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** June 5, 2019 at 8:04:48 AM EDT
> **To:** "Clifford.destiny@yahoo.com" <Clifford.destiny@yahoo.com>
> **Subject: Fwd: Letter of harassment/Administrative Leave Destiny Clifford 81009**

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <                              >
> **Date:** March 8, 2019 at 10:30:00 AM EST
> **To:** "                              " <                              >
> **Subject: Letter of harassment/Administrative Leave Destiny Clifford 81009**
> **Reply-To:** Destiny Clifford <                              >

Dear Ms Sharon Boston,

This is Destiny Clifford RN BSN Clinical Coordinator of PACU. I would like to ensure that you are receiving my documents because at this time I have not received any response from you.

Destiny Clifford
404-936-2689
or please
Email your response.

harassment letter.pages
269.7kB

about:blank                                                                                                                 Page 1 of 1



# HUMAN RESOURCE

EMPLOYEE COMPLAINT OF HARASSMENT & INTIMIDATION

MARCH 8, 2019

Destiny A. Clifford RN BSN (81009)
Clifford.destiny@yahoo.com
(404)936-2689

*Previously Reported Surgical Services Management*

Dear Ms. Sharon Boston,

I was fearful of reporting management to human resources because of my previous encounter. But managements intentions need to be clearly assessed because I am experiencing continued harassment. When I state 'management' in my paragraphs below. I am referring to surgical services management (Vangie Dennis, Nerissa Thompson, Patty Hood and Sherry Copper.)

### Workplace harassment is a form of discrimination.

I (Destiny Clifford) am experiencing power harassment. Hierarchy bullying has negatively impacted my work life, my psychological well being as a subordinate and my physical health. Employees should be able to come into a positive healthy work environment each day without feeling intimidation by superiors. This superior intimidation has diminished my productivity and self-esteem both in and out of the workplace. This intimidation has created a hostile work environment which has interfered with my work success.

### I have previously initiated a harassment complaint on the record with human resources.

Employees should not feel intimidated regarding their need to reach out to human resources for assistance. It is my right as an employee to seek the assistance of human resources that my claims be addressed adequately against unwanted behavior from my superiors. Wellstar Atlanta Medical Center has a strong policy regarding employee experiencing harassment/a hostile work environment. After seeking the assistance of human resources I made a harassment report. In response to the making of my report I was addressed by management (which is continued harassment). Management stated that my report to human resources were 'low' and the 'I did not have to go there.'



*I believe that management is targeting and seeking revenge.*

I believe that management is targeting and over handling me. It seems as if management is diligently working to intentionally build a negative record regarding my work character by creating and stretching the truth as to fabricate complaints in retaliation for the justification of a reasonable dismissal.

*Management has failed to professionally communicate with me in any leadership capacity.*

Since my return to work after experiencing a massive hemorrhagic stroke on December 2, 2018 the pressures of management has increased due to my illness. The only interaction between management and myself was placing me in a 'charge nurse' position, giving me an inflated disciplinary action, followed by placing me on Administrative Leave which has never been practiced with our employees for a medication error without causing any adverse reaction. Otherwise there has been no other involvements with me as a clinical leader. I feel that I am being avoided. Management avoids talking to me and have removed me from my clinical coordinator responsibilities which are now being handled by staff members instead of myself.

*On February 2, 2019 I requested to step down from the Clinical Coordinator position.*

As Clinical Coordinator of the PACU department I feel that I am being treated with low professional standard. Professionally I feel isolated as a leader. My presence has been denied by management. My professional ideas are opposed by management. I feel put down and belittled on a personal level intentionally. I believe that management is skillfully working against me. I have made a request to be removed from the Clinical Coordinator position to release myself of the continued agony. My goal was to remove myself from leadership and avoid reporting management to human resources that I do continue to be harassed. However harassment must be reported.

*Part of my previous human resource report was centered around excessive demands being made by management.*

Management insisted that it was my job and I was being held responsible for picking up 'all' on-call hours that employees failed to fulfill. The 'on-call' demands were impossible to meet and was a very unfair act. It was a very unhealthy situation so I complained of 'no work-life balance and human resources looked into the matter and corrected the issue stating that it was not my responsibility to be on continuous call.



*Being 'On-Call' and understaffed are the biggest issues in the PACU.*

Since my return to work on February 9, 2019 after my stroke I was placed on a medical restriction. My restriction states that I am not to work night call hours because of the nature of medications I am taking. After showing no regard for my illness, this matter has intensified my feelings of harassment and intimidation because now I have added to the problem of the unit. Even after presenting Nerissa Thompson (Manager) the proper documentation regarding my medical restriction she insisted that I must take night call regardless regardless of the doctors orders. With PACU being short staffed at times me not taking call has caused increased frustration.

*As a registered nurse of nearly 20 years I could clearly see that I am in a unwanted position by management.*

As a Wellstar employee I was denied the proper hourly rate for my Clinical Coordinator position. I was being demoted to a charge nurse with the expectations of also carrying out the Clinical Coordinator position. I was denied the opportunity to represent the correct clinical position on my employee badge. And I was being held responsible for fulfilling excessive 'on-call' demands. All was part of my previous complaint with human resources. Now I have been confronted with human resources. I was instructed to hand over my employee identification. I was removed from the hospital premise by being escorted by leadership to the front door. I have been placed on leave without clearing understanding why I have been placed on leave.   I have not been presented with any documentation or signed any agreement. I have been told that I am under investigation but was never told exactly what kind of investigation. Ever since, I have been suffering from humiliation. Tremendous stress and anxiety. I have been having extreme headaches and insomnia because of these excessive measures being taken against me. I am experiencing fear of losing my job placement with Wellstar Atlanta Medical Center because of managements harassment behaviors.

*The hospital transportation system has PACU on the priority for transporting patients.*

I have engaged in important conversations with Ambassador Bernard about PACU's priority regarding the transport system. Because of the minimal employees in transport services PACU is forced to move their own patients to promote 'throughput' which will also allow the depart to continue receiving post-surgical patients.

I have been working in a 'charge nurse' position so I have been continuously in the PACU patient care area. If I am not in the patient care area I am transporting patients to their primary nurse on the floor after the patient has recovered. Nurses have been very grateful for me transporting their patients to the floor that it allows them to complete their charting. Nurses usually seek me out to perform this duty. However in our meeting on February 21, 2019 Vangie Dennis states that all nurses are complaining that they never know where I am. This is a false statement because where else would I be. I don't even go into my office anymore because now I am managing the clinical floor.

*The same continuous complaints that are not true.*

One morning I was being contacted by management on my cell phone by text that staff members in the PACU were looking for me and that I was no where to be found. The irony to this matter is that I was the only employee in the clinical area. Nurses had not arrived to work yet. I went to use the bathroom. I was told that I needed to be held accountable and the matter was inflated. So me missing off the unit is continuous and highly fabricated.

*All the nurses in the department are complaining that when I am at work it is chaos.*

In the February 21, 2019 meeting I was informed that 'ALL' the nurses were complaining that I ran the floor in a disordered fashion. That is was in chaos and management does not check to see how the floor is operating. Stating that all staff members stated that I don't understand how the floor operates but I am the one who hired and oriented them to the floor. I am the one who created the the department guideline for how the floor should run. Yes I asked some question because there has been department changes since I was on sick leave and I was re-orientating my back to the unit. But chaos. No. These are exaggerated tactics to make me feel intimidated by management who fails to even say 'Hello'. Every nurse ask questions. So please have them provide statements as to why all staff members have stated this. This does not make sense.

*I discovered that with me being in the clinical area nurses did not like me correcting them on clinical issues.*

Leaving their computer screen unsecured, narcotics left on computers while they left the floors and nurses refusing to take lunches in a timely manner. Nurses want to take lunches at their convenience but not when most optimal so they complain when their needs are not being met. And some nurses are highly dependable upon my assistance even when they know that I have my hands full of is providing post operative care to my own assigned patient. So in all matters I have taken pictures of their errors. I have addressed it with them so I would assume that my presence on the clinical floor would not be most delightful when they are being coached about their own behaviors. My thinking is that if 'ALL' the employees are complaining then we should have a moment where all issues are being addressed. However management states that we've lost the trust factor and I should not address them. However the employees complained tremendously that since I was out on leave during my illness the department was in bad condition, there was never any supplies and that with all the call they were thinking about getting another job. So least I know that their complaining is continuous and we all have something to work on. So when I returned I developed established our need for central supply services and tried to update things that had not been addressed. But no one will address that. I returned to work to assist with services. Not prevent them from happening.

*Human Resource Complaint: August 1, 2018 No job description was given*

Because of the harassment I was receiving from management I requested that I leave the PACU and transfer to Labor and Deliver with Ms. Heniha (Manager). I was interviewed and acceptable for transfer. I did not leave the unit because Vangie Dennis spoke with me and ensured that everything would be okay. She states that she was going to type up a job

description for the Clinical Coordinator position so that we are aware what the responsibilities are. I spoke with Vangie about what the old job description says and what I was currently performing. Vangie states that her and Nerna would type out a more defined job description be the previous one did not help and they were new employees coming from Emory. Because the surgical department was not in good shape I work above and beyond to assist with organizing the surgical department as well as with JOINT COMMISSION in the operating room. I was doing work that had nothing to do with PACU but worked as a team member. So in order to define my position Vangie stated that they were going to type out a description that we are all on the same page. As promised there is still no job description to ensure that we are on the same page. I have never been corrected by my management that I am not performing my duties. But for some reason I was brought in front of the management team stating that my performance is chaotic with no proof of disorder. That the staff is disgruntled.

### As the Clinical Coordinator I created the department guideline manual because no guidelines were provided for the staff.

The guideline manual covers the responsibilities of the unit including the expectations of the charge nurse and job descriptions at the beginning and end of the day. These job descriptions have been provided for all nurses. My first week back from my illness I heard one of the nurses asking Nerissa for a copy of charge nurse duties. I quickly responded by saying I can print out a copy because I have already created the responsibility list. I placed charge nurse responsibilities in a green folder at the nurses station. I know that Nerissa and myself were having issues with Jennifer and Deborah just sitting behind the nurses station and not participating in assisting the nurses on the floor so I took action. Nerissa Thompson has still not provided her version of what should be done. No description has been made even until this point for nurse observation beside the one I created. But for some reason I was brought in front of the management team stating that my performance is chaotic with no proof of disorder. That the staff is disgruntled.

As Clinical Coordinator I received a new job description from Human Resources. In my job description I have the authority to determine how the floor will operate and can delegate responsibility. It was explained that I was a "front line manager" by management however it seems as if my authority to make decisions have been taken away. My suggestion is that if the staff is continually disgruntled then it is best that I be removed from the position. Which was my suggestion on March 6, 2019.

Thank You.

description for the Clinical Coordinator position so that we are aware what the responsibilities are. I spoke with Vangie about what the old job description says and what I was currently performing. Vangie states that her and Nerria would type out a more defined job description be the previous one did not help and they were new employees coming from Emory. Because the surgical department was not in good shape I work above and beyond to assist with organizing the surgical department as well as with JOINT COMMISSION in the operating room. I was doing work that had nothing to do with PACU but worked as a team member. So in order to define my position Vangie stated that they were going to type out a description that we are all on the same page. As promised there is still 'no' job description to ensure that we are on the same page. I have never been corrected by my management that I am not performing my duties. But for some reason I was brought in front of the management team stating that my performance is chaotic with no proof of disorder. That the staff is disgruntled.

### *As the Clinical Coordinator I created the department guideline manual because no guidelines were provided for the staff.*

The guideline manual covers the responsibilities of the unit including the expectations of the charge nurse and job descriptions at the beginning and end of the day. These job descriptions have been provided for all nurses. My first week back from my illness I heard one of the nurses asking Nerissa for a copy of charge nurse duties. I quickly responded by saying I can print out a copy because I have already created the responsibility list. I placed charge nurse responsibilities in a green folder at the nurses station. I know that Nerissa and myself were having issues with Jennifer and Deborah just sitting behind the nurses station and not participating in assisting the nurses on the floor so I took action. Nerissa Thompson has still not provided her version of what should be done. No description has been made even until this point for nurse observation beside the one I created. But for some reason I was brought in front of the management team stating that my performance is chaotic with no proof of disorder. That the staff is disgruntled.

As Clinical Coordinator I received a new job description from Human Resources. In my job description I have the authority to determine how the floor will operate and can delegate responsibility. It was explained that I was a 'front-line manager' by management however it seems as if my authority to make decisions have been taken away. My suggestion is that if the staff is continually disgruntled then it is best that I be removed from the position. Which was my suggestion on March 6, 2019.

Thank You.

## Fwd: Wellstar Policy for handling medication errors

**Destiny Clifford** <clifford.destiny@yahoo.com>

Thu 4/30/2020 3:48 PM

**To:** ODS02538CPC <ODS02538CPC@OfficeDepot.com>



Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** April 29, 2020 at 11:49:05 AM EDT
> **To:** "Clifford.destiny@yahoo.com" <clifford.destiny@yahoo.com>
> **Subject: Re: Wellstar Policy for handling medication errors**

On Tuesday, May 28, 2019, 12:04:03 PM EDT, Destiny Clifford <clifford.destiny@yahoo.com> wrote:

Sent from my iPhone

Begin forwarded message:

> **From:** Destiny Clifford <clifford.destiny@yahoo.com>
> **Date:** March 8, 2019 at 1:04:39 PM EST
> **To:** "Sharon.boston@wellstar.org" <Sharon.boston@wellstar.org>
> **Subject: Wellstar Policy for handling medication errors**

Please provide me with a copy of how Downtown Wellstar Atlanta Medical handles medication errors. And the particular part of the policy that that would require an Administrative Leave process to be initiated that could best understand why I have been removed from my job without documentation. Thanks

Sent from my iPhone

## RE: [**WARNING** EXTERNAL MAIL] Letter of harassment/Administrative Leave Destiny Clifford 81009

From:  Boston, Sharon (sharon.boston@wellstar.org)

To:  clifford.destiny@yahoo.com

Date:  Monday, March 11, 2019, 8:43 AM EDT

Good Morning Destiny,

I wanted to circle back to you from my email below concerning your emails. Again, I would like to thank you for bringing forth your complaint and wanted to let you know that we take these complaints seriously. As is customary with investigations, you will be contacted to discuss your concerns. I will be in touch with you with you soon.


Regards,

Sharon



**From:** Boston, Sharon
**Sent:** Friday, March 08, 2019 4:46 PM
**To:** 'Destiny Clifford'
**Subject:** RE: [**WARNING** EXTERNAL MAIL] Letter of harassment/Administrative Leave Destiny Clifford 81009


Hi Destiny,

Thanks for sharing your concerns. I will look into it.


Thanks,

Sharon



**From:** Destiny Clifford [mailto:clifford.destiny@yahoo.com]
**Sent:** Friday, March 08, 2019 10:30 AM
**To:** Boston, Sharon



## RE: [**WARNING** EXTERNAL MAIL] No Response Given

From: Boston, Sharon (sharon.boston@wellstar.org)

To: clifford.destiny@yahoo.com

Date: Thursday, July 11, 2019, 11:52 AM EDT

Good Morning Destiny,

Vangie has made me aware that she has been trying to get ahold of you via phone and text to schedule a meeting with you for this Friday to discuss the results of the investigation. Vangie explained that she has been unable to leave a voicemail for you because your voicemail is full and that you have not responded to her text messages.

I wanted to make you aware that it is OK for you to respond to her request to meet with you. It is imperative that you do so today.
Please either respond to the text message that she previously sent to you or call her directly on 404-805-1487.

Regards,
Sharon

-----Original Message-----
From: Destiny Clifford [mailto:                    ]
Sent: Wednesday, July 10, 2019 7:24 PM
To: Boston, Sharon
Subject: [**WARNING** EXTERNAL MAIL] No Response Given

Hello Sharon Boston,

I have been off of work for 5 months regarding an alleged medication error where no documentation has ever been presented or any questions or emails sent to me in any form since March 6, 2019 the day you released me on Administrative Leave.

WELLSTAR or any employee associated with Wellstar has NEVER presented me with any proof of accusation. For the record I have been away from my job for a substantial amount of time which is very humiliating regarding this matter. No one has even addressed my concerns of harassment and this is another form of their harassment.

I have recorded conversations and
written documention of every conversation to support my claims for further legal action.

Wednesday I received a call from Vangie Dennis stating that she and Nerissa wants to meet with me and discuss the results of the investigation; however it was made clear to me by you that I am not to communicate with hospital staff since legal is involved. However that does not mean that you totally ignore all of my initial request regarding documentation, Complaints, Policies and even a meeting with HR to verbalize my harassment concerns.

As Human Resourse Representative you have failed to show ANY CONCERN! As an employee I feel that the system has abused me. Please provide all documented proof in written form

Wellstar Atlanta Medical policy regarding Administrative Leave at the time of my dismissal.

WEH-19-07-0016
BIN B753
Wellstar, alertline, com   7/13/2019



# Corporate Office

# Compliance Hotline

# 'Employee Harassment'

— Protective
Authority
System

Wellstar AMC

E. Brickerstaff (Pres. HR)
" called to attend 7/15/19 meeting

# Separation Notice



# 2020 Hospital
# National Patient Safety Goals

The purpose of the National Patient Safety Goals is to improve patient safety. The goals focus on problems in health care safety and how to solve them.

## Identify patients correctly

**NPSG.01.01.01** — Use at least two ways to identify patients. For example, use the patient's name *and* date of birth. This is done to make sure that each patient gets the correct medicine and treatment.

**NPSG.01.03.01** — Make sure that the correct patient gets the correct blood when they get a blood transfusion.

## Improve staff communication

**NPSG.02.03.01** — Get important test results to the right staff person on time.

## Use medicines safely

**NPSG.03.04.01** — Before a procedure, label medicines that are not labeled. For example, medicines in syringes, cups and basins. Do this in the area where medicines and supplies are set up.

**NPSG.03.05.01** — Take extra care with patients who take medicines to thin their blood.

**NPSG.03.06.01** — Record and pass along correct information about a patient's medicines. Find out what medicines the patient is taking. Compare those medicines to new medicines given to the patient. Make sure the patient knows which medicines to take when they are at home. Tell the patient it is important to bring their up-to-date list of medicines every time they visit a doctor.

## Use alarms safely

**NPSG.06.01.01** — Make improvements to ensure that alarms on medical equipment are heard and responded to on time.

## Prevent infection

**NPSG.07.01.01** — Use the hand cleaning guidelines from the Centers for Disease Control and Prevention or the World Health Organization. Set goals for improving hand cleaning. Use the goals to improve hand cleaning.

**NPSG.07.03.01** — Use proven guidelines to prevent infections that are difficult to treat.

**NPSG.07.04.01** — Use proven guidelines to prevent infection of the blood from central lines.

**NPSG.07.05.01** — Use proven guidelines to prevent infection after surgery.

**NPSG.07.06.01** — Use proven guidelines to prevent infections of the urinary tract that are caused by catheters.

## Identify patient safety risks

**NPSG.15.01.01** — Reduce the risk for suicide.

## Prevent mistakes in surgery

**UP.01.01.01** — Make sure that the correct surgery is done on the correct patient and at the correct place on the patient's body.

**UP.01.02.01** — Mark the correct place on the patient's body where the surgery is to be done.

**UP.01.03.01** — Pause before the surgery to make sure that a mistake is not being made.

The Joint Commission
Accreditation
*Hospital*



This is an easy-to-read document. It has been created for the public. The exact language o[f] be found at www.jointcommission.org.

# R³ Report  Requirement, Rationale, Reference

A complimentary publication of The Joint Commission

Issue 19, Dec. 7, 2018

Published for Joint Commission-accredited organizations and interested health care professionals, *R3 Report* provides the rationale and references that The Joint Commission employs in the development of new requirements. While the standards manuals also may provide a rationale, *R3 Report* goes into more depth, providing a rationale statement for each element of performance (EP). The references provide the evidence that supports the requirement. *R3 Report* may be reproduced if credited to The Joint Commission. Sign up for email delivery.

## National Patient Safety Goal for anticoagulant therapy

Effective July 1, 2019, eight new elements of performance will be applicable to all Joint Commission-accredited hospitals, critical access hospitals, nursing care centers, and medical centers (accredited under the ambulatory health care program). These new requirements are at NPSG.03.05.01 in the "National Patient Safety Goals" chapter.

For years, this NPSG has played an important role in improving the safety of patients receiving anticoagulation therapy. However, there has been a rise in adverse drug events associated with direct oral anticoagulants (DOACs), and The Joint Commission believes that relevant updates to this NPSG to address DOACs may help reverse that trend.

### Engagement with stakeholders, customers, and experts

In addition to an extensive literature review and public field review, The Joint Commission obtained expert guidance from the following groups:

Technical advisory panel (TAP) of clinicians from health care and academic organizations and professional associations.

Standards review panel (SRP) consisted of representatives from organizations or professional associations who provide a "boots on the ground" point of view and insights into the practical application of the proposed standards.

The prepublication version of the standards will be available on the Prepublication Standards section of the Joint Commission website until June 30, 2019.  After July 1, 2019, access the standards in the E-dition or standards manual.

## National Patient Safety Goals

**NPSG.03.05.01: Reduce the likelihood of patient harm associated with the use of anticoagulant therapy.**

*Note: This requirement does not apply to routine situations in which short-term prophylactic anticoagulation is used for venous-thromboembolism prevention (for example, related to procedures or hospitalization).*

| Requirement | EP 1: The [hospital/organization] uses approved protocols and evidence-based practice guidelines for the initiation and maintenance of anticoagulant therapy that address medication selection; dosing, including adjustments for age and renal or liver function; drug-drug and drug-food interactions; and other risk factors as applicable. |
| --- | --- |

© 2018 The Joint Commission

 The Joint Commission

R³ Report   Requirement, Rationale, Reference

National Patient Safety Goal for anticoagulant therapy

| Rationale | Anticoagulation medications are high-risk medications due to complex dosing, insufficient monitoring, and inconsistent patient compliance. The introduction of direct oral anticoagulants, as an alternative to heparin and warfarin, requires organizations to modify existing protocols and use evidence-based practice guidelines to address the initiation and maintenance of all anticoagulation medications and their associated risk factors. |
|---|---|
| References* | Reardon DP, et al. "Implementation of a Hemostatic and Antithrombotic Stewardship Program." *Journal of Thrombolysis & Thrombolysis* 40, no. 3 (Oct 2015): 379-82. Raschi E, et al. "Emerging Therapeutic Uses of Direct-Acting Oral Anticoagulants: An Evidence-Based Perspective." *Pharmacological Research* 120 (Jun 2017): 206-18. Witt DM, et al. "Guidance for the Practical Management of Warfarin Therapy in the Treatment of Venous Thromboembolism," *Journal of Thrombosis & Thrombolysis* 41, no. 1 (Jan 2016): 187-205. |
| Requirement | EP 2: The [hospital/organization] uses approved protocols and evidence-based practice guidelines for reversal of anticoagulation and management of bleeding events related to each anticoagulant medication. |
| Rationale | Bleeding is the most common complication of all anticoagulants. In addition to heparin and warfarin, each of the direct oral anticoagulants have different reversal mechanisms. It is important for organizations to use evidence-based practice guidelines when developing protocols to manage bleeding events. For timely and appropriate management, providers need to be aware of the variations in presentation severity (e.g., location and severity of bleeding, indication for reversal) and appropriate reversal agents (e.g., drug discontinuation, use of concentrated clotting therapy) for each anticoagulation medication used by patients coming to their organization. |
| References* | Tomaselli GF, et al. "2017 ACC Expert Consensus Decision Pathway on Management of Bleeding in Patients on Oral Anticoagulants: A Report of the American College of Cardiology Task Force on Expert Consensus Decision Pathways." *Journal of the American College of Cardiology* 70, no. 24 (Dec 19, 2017): 3042-67. Samuelson BT and Cuker A. "Measurement and Reversal of the Direct Oral Anticoagulants." *Blood Reviews* 31, no. 1 (Jan 2017): 77-84. |
| Requirement | EP 3: The hospital uses approved protocols and evidence-based practice guidelines for perioperative management of all patients on oral anticoagulants. Note: *Perioperative management may address the use of bridging medications, timing for stopping an anticoagulant, and timing and dosing for restarting an anticoagulant.* |
| Rationale | Patients taking oral anticoagulation medications need to be managed appropriately during the perioperative period to minimize bleeding risks during surgery. The decision to stop an anticoagulant, use a bridging medication, or to restart an anticoagulant should be based on organization-approved protocols and evidence-based practice guidelines that address the patient's bleeding risk and renal function, as well as the half-life of the medication. |
| References* | Burnett AE, et al. "Guidance for the Practical Management of the Direct Oral Anticoagulants (DOACs) in VTE Treatment," *Journal of Thrombosis & Thrombolysis* 41, no. 1 (Jan 2016): 206–232. Spyropoulos AC, et al. "Uptake and Utilization of the Management of Anticoagulation in the Periprocedural Period App: Longitudinal Analysis," *JMIR Mhealth Uhealth.* (Dec 21, 2018);6(12): e11090. Sunkara T, et al. "Perioperative Management of Direct Oral Anticoagulants (DOACs): A Systemic Review," *Health Services Insights* 9, no. Suppl 1 (Dec 13, 2016): 25-36. |

© 2018 The Joint Commission

 The Joint Comm



| Requirement | EP 4: The [hospital/organization] has a written policy addressing the need for baseline and ongoing laboratory tests to monitor and adjust anticoagulant therapy. <br><br> Note: For all patients receiving warfarin therapy, use a current international normalized ratio (INR) to monitor and adjust dosage. For patients on a direct oral anticoagulant (DOAC), follow evidence-based practice guidelines regarding the need for laboratory testing. |
| --- | --- |
| Rationale | Baseline and ongoing laboratory tests ensure that patients on anticoagulation medications are monitored and dosed appropriately. For patients receiving heparin and warfarin, routine laboratory testing includes partial thromboplastin time (PTT) and international normalized ratio (INR). Although direct oral anticoagulants (DOACs) were designed to be given at fixed doses and do not require routine coagulation monitoring, in selected instances, the interpretation of coagulation laboratory results is important for optimal management of DOAC toxicity or reversal. Regular monitoring of renal function and liver function should also be considered. |
| References* | Gosselin RC and Adcock DM. "The Laboratory's 2015 Perspective on Direct Oral Anticoagulant Testing." *Journal of Thrombosis & Haemostasis* 14, no. 5 (May 2016): 886-93. <br><br> Holbrook A, et al. "Evidence-based Management of Anticoagulant Therapy: Antithrombotic Therapy and Prevention of Thrombosis, 9th ed: American College of Chest Physicians Evidence-Based Clinical Practice Guidelines," *Chest* 141, no. 2 Suppl (Feb 2012): e152S-e184S. <br><br> Levenson D. "Testing Dilemmas for Direct Oral Anticoagulants," *Clinical Laboratory News* (July 1, 2016). https://www.aacc.org/publications/cln/articles/2016/july/testing-dilemmas-for-direct-oral-anticoagulants <br><br> Witt DM, et al. "Guidance for the Practical Management of Warfarin Therapy in the Treatment of Venous Thromboembolism," *Journal of Thrombosis & Thrombolysis* 41, no. 1 (Jan 2016): 187-205. |
| Requirement | EP 5: The [hospital/organization] addresses anticoagulation safety practices through the following: <br> - Establishing a process to identify, respond to, and report adverse drug events, including adverse drug event outcomes <br> - Evaluating anticoagulation safety practices, taking actions to improve safety practices, and measuring the effectiveness of those actions in a time frame determined by the organization |
| Rationale | The prevention of adverse drug events (ADEs) is an important patient safety priority. Anticoagulant medications, which include warfarin, heparin, low-molecular weight heparin, and direct oral anticoagulants, are one of four medication classes commonly identified as a cause of ADEs. Identification of common, preventable, and measurable healthcare-associated anticoagulant ADEs is a key component of quality improvement efforts to drive prevention, benchmark progress, and promote a culture of anticoagulation safety. |
| References* | Agency for Healthcare Research and Quality. *AHRQ National Scorecard on Rates of Hospital-acquired Conditions; Updated Baseline Rates and Preliminary Results 2014-2016.* Rockville, MD: AHRQ, June 2018. https://www.ahrq.gov/professionals/quality-patient-safety/pfp/index.html <br><br> Wychowski MK, et al. "The Scope and Value of an Anticoagulation Stewardship Program at a Community Teaching Hospital," *Journal of Thrombosis & Thrombolysis* 43, no. 3 (Apr 2017): 380-86. |

R Report Registered Radicode Reviews

National Patient Safety Goal for anticoagulant therapy

| Requirement | EP 6: The [hospital/organization] provides education to patients and families specific to the anticoagulant medication prescribed, including the following:<br>- Adherence to medication dose and schedule<br>- Importance of follow-up appointments and laboratory testing (if applicable)<br>- Potential drug-drug and drug-food interactions<br>- The potential for adverse drug reactions |
|---|---|
| Rationale | Nonadherence to anticoagulation therapy places patients at risk for bleeding and/or clotting that can lead to severe adverse drug events. It is important that patient and family education emphasizes medication adherence, dose and schedule compliance, drug and food interactions, and the need for follow-up appointments and ongoing laboratory tests. It is important to educate patients taking anticoagulants that some foods and medicines can cause adverse interactions that can lead to an increase risk of bleeding while others can lead to an increase risk of developing blood clots. |
| References* | Burnett A, et al. "Guidance for the Practical Management of the Direct Oral Anticoagulants (DOACs) in VTE Treatment," *Journal of Thrombosis & Thrombolysis* 41, no. 1 (Jan 2016): 206-232.<br><br>Office of Disease Prevention and Health Promotion, "Section 5: Anticoagulants." IN: *National Action Plan for Adverse Drug Event Prevention.* Rockville, MD: U.S. DHHS, ODPHP, 2014, 50-98. https://health.gov/hcq/pdfs/ade-action-plan-508c.pdf<br><br>Reardon DP, et al. "Implementation of a Hemostatic and Antithrombotic Stewardship Program," *Journal of Thrombosis & Thrombolysis* 40, no. 3 (Oct 2015): 379-82. |
| Requirement (existing) | EP 7: The [hospital/organization] uses only oral unit-dose products, prefilled syringes, or premixed infusion bags when these types of products are available.<br><br>*Note: For pediatric patients, prefilled syringe products should only be used if specifically designed for children.* |
| Rationale | Use of oral unit-dose products, prefilled syringes and premixed infusion bags reduces the risk of dosing and medication errors, while increasing patient safety because of their high level of accuracy in delivering medications.<br>*This is an existing Joint Commission requirement that has been renumbered.* |
| Requirement (existing) | EP 8: When heparin is administered intravenously and continuously, the [hospital/organization] uses programmable pumps to provide consistent and accurate dosing. |
| Rationale | Use of programmable pumps ensures consistent and accurate administration of heparin.<br>*This is an existing Joint Commission requirement that has been renumbered.* |

*Not a complete literature review.



© 2018 The Joint Commission


The Joint Commission

# WELLSTAR.
## Health System

# EMPLOYEE COUNSELING REPORT

**EMPLOYEE NAME:** Destiny Clifford

**JOB TITLE:** Clinical Coordinator RN

**DEPARTMENT NAME:** PACU

**LOCATION/SITE:** AMCD

**EMPLOYEE #:** 81009

**DATE ISSUED:** ____

**DEPARTMENT #:** 2657062190

**TYPE OF ACTION (CHECK ONE):**

☐ Verbal notice

☐ First notice and written counseling warning

☐ Final notice

☒ Discharge

*[Handwritten, right side:] I Destiny Clifford was not allow to have a witness present. to witness I am being. held in a room with Detra Bickerstaff, Sharon Boston, Vangie Davis and Nerissa Thompson. No documentat was provide*

**PERFORMANCE DEFICIENCY:** Violation of Policy MU-70-01: Continuous IV Heparin Therapy Procedure. *regarding the Administrative Process — Sharon Boston.*

**SPECIFIC DETAILS:** *Stated she did not have to provide me any documentation regarding the Administrative Leave.* 2/18/2019 Destiny accepted a patient from the OR with a Heparin infusion. Destiny later delivered the patient to the medical surgical floor with the Heparin not being connected to an IV pump. This is a violation of the policy and also a violation of the Joint Commission National Patient Safety Goals NPSG.03.05.01: Take extra care with patients who take medicines to thin their blood. Additionally Destiny did not give a proper Heparin hand off report to the receiving nurse. *I told her I will*

**SUMMATION:** Destiny failed to follow policy MU-70-01: Continuous IV Heparin Therapy Procedure and The Joint Commission National Patient Safety Goals NPSG.03.05.01. *request it again.*

**ACTION TAKEN:** Termination of employment effective immediately. *No Proof of Claim, was given regarding their Heparin Claim. All Accusation*

*[Handwritten left margin, bottom to top:] no one gave me a legit exist on Wardabl or signature when taken. a legit administration no documentation*

**Prepared by:** Nerissa Thompson

**Title:** Nurse Manager

**Signature:** _____

**Date:** 7-15-19

**Department Head Signature:** Vangie Davis

**Date:** 7-15-19

*[Handwritten right:] No other nurse has be placed*

I HAVE READ AND UNDERSTAND THIS COUNSELING. SIGNATURE OF EMPLOYEE OR WITNESS DOES NOT IMPLY AGREEMENT WITH THE STATEMENT. THE EMPLOYEE IS ENCOURAGED TO INCLUDE COMMENTS ON THE REVERSE SIDE OF THIS DOCUMENT.

*[Handwritten right:] on administrative leave regarding Medication, No training regarding Administ leave*

**Employee Signature:** _____

*Please see reverse side for more documentation*

**Date** 7-15-19

**Witness, if needed** Sharon Boston

**Date**

*Send Original Signed Copy to Human Resources. Provide Photocopy to Manager. Provide Photocopy to Employee*

*[Handwritten:] turn over*



No time to express my concern on the sheet.
Everyone said they are a witness.
I was asked to turn off my [?],
they did not allow [?].
Vargie's claim is [?] the same
Claim. It has [?] to have
recording. I am being treated
unfairly. The management
states that they do not want to
hear my side of the story when
their claims are _false_. Vargie
makes a recording that I Destiny
Clifford received the pt from the OR.
and did not place them on the Heparin
drip. I charted that I did and
she was on Heparin by nurse Lea (OR).
I remove the pt from the IV pump
when on the 5th Floor. I am being
accused of not having the pt on the pump

 **GDCR** ATTORNEYS AT LAW



July 2, 2020

**Via EEOC Portal**

Triet Bui
Investigator
U.S. Equal Employment Opportunity Commission
Atlanta District Office
100 Alabama St. SW, Suite 4R30
Atlanta, Georgia 30303

    Re:    **Charging Party:**    **Destiny A. Clifford**
             **Respondent:**    **Wellstar Atlanta Medical Center**
             **Charge No.:**    **410-2019-07187**

Dear Ms. Bui:

    Please note for your file that the undersigned represents Wellstar Atlanta Medical Center ("AMC") with respect to the above referenced Charge of Discrimination filed by Destiny A. Clifford.[1][2] In her Charge, Ms. Clifford alleges she was discriminated against and harassed because

---

[1] The information and accompanying documentation contained herein, and that which may be submitted hereafter, is strictly confidential and not to be used for any purpose other than the resolution of the current Charge and it may not be disclosed publicly. See 42 U.S.C. §§ 2000e-5(b); 2000e-8(e); 29 C.F.R. §§ 1601.22, 1601.26; and 56 Fed. Reg. 10847. To the extent Charging Party is in receipt of this information or accompanying documentation, Charging Party is advised that this information is strictly confidential and should not be disclosed publicly or to any individual unless they have a privileged relationship with that individual. Information and accompanying documentation contained herein designated confidential and/or containing sensitive medical information, confidential commercial or financial information, or trade secret information may not be disclosed to Charging Party.

[2] This response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the agency in its investigation and facilitating the informal resolution of these matters. This response, while believed to be accurate, does not constitute an affidavit or binding statement of AMC's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Charging Party's allegations. Because additional facts likely would be uncovered through discovery or following a full investigation, AMC in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, AMC does not waive, and hereby preserves, any and all substantive and procedural

9 Atlanta Stre
Marietta, Georgia 300

2951 Flowers Road South, Suite 8
Atlanta, Georgia 303

Gregory, Doyle, Calhoun & Rogers, L

*Changed !*

### III. Ms. Clifford's Employment Is Terminated Due Her Failure To Ensure A Patient Was Receiving Medication As Prescribed By The Patient's Doctor.

On February 19, 2019, Ms. Clifford accepted a patient from the operating room who was being administered heparin via an intravenous ("IV") pump. (Heparin is a blood thinner generally used to treat and prevent blood clots.) However, when Ms. Clifford delivered the patient to the medical surgical floor, the heparin was no longer connected to the IV pump. As a result, the patient was no longer receiving any heparin.

Ms. Clifford's failure to ensure the patient was being consistently administered heparin was as serious violation of AMC policy (specifically AMC Policy MU-70-01, *see* Exhibit E) as well as the Joint Commission's[3] National Patient Safety Goals. Her violation of policy jeopardized the health of the patient and, in turn, created a significant risk to AMC. Not only did Ms. Clifford not ensure the patient was continuously receiving heparin through the IV pump, she failed to properly complete the hand-off report when she delivered the patient to the medical surgical floor. To allow AMC management to investigate the situation, Ms. Clifford was placed on paid administrative leave.

Shortly after Ms. Clifford was placed on leave, Ms. Clifford began sending emails to AMC employees. Among other things, these emails alleged that she was highly stressed as a result of the situation and that a hostile work environment had been created for her.[4] In addition to receiving emails directly from Ms. Clifford, AMC received a letter from Ms. Clifford's attorney demanding no less than $2 million dollars. Neither Ms. Clifford nor her attorney provided any specific examples of harassment and neither provided any information to suggest Ms. Clifford did not violate AMC policy on February 19.

The investigation confirmed Ms. Clifford received training on the administration of heparin, including completing a course entitled Heparin Infusion Orders and Workflow Updates. In addition, the investigation showed several of Ms. Clifford's co-workers had raised concerns about Ms. Clifford prior to the February 19 incident, including reporting Ms. Clifford's failure to remember and follow policies and procedures and disappearing from the PACU for extended periods of times. Although no formal discipline had yet been issued, Ms. Clifford's Manager, Narissa Thompson, met with Ms. Clifford several times to discuss her work performance and developed similar concerns.

After reviewing all of the information, including the additional communications from Ms. Clifford and her attorney, AMC decided to terminate Ms. Clifford's employment. Her failure to ensure the patient was continuously being administered heparin created a significant risk to the patient's health and was a serious violation of AMC policy. This violation was especially egregious given that she received training on the policy and was in a supervisor position.

---

[3] The Joint Commission accredits and certifies health care organizations and programs in the United States.

[4] Notably, in one of these emails (on March 8, 2019), Ms. Clifford identified herself as the Clinical Coordinator, *see* Exhibit F, despite the allegation in her Charge that she was demoted to Charge Nurse on January 15, 2019.



of her disability.  For the reasons set forth below, AMC denies the allegations set forth in Ms. Clifford's Charge.

## FACTUAL BACKGROUND

### I.    Ms. Clifford Is Hired By AMC.

AMC operates a medical center located in midtown Atlanta.  AMC is an equal opportunity employer and maintains and enforces policies prohibiting discrimination or harassment on any legally protected basis.  AMC policy also prohibits retaliation against anyone who makes a complaint about discrimination or harassment.  In addition, AMC maintains a policy on the accommodation of individuals with disabilities.  Copies of those policies are attached hereto as Exhibit A.

AMC hired Ms. Clifford in August 2017 in the position of RN Unit Coordinator in the Post-Anesthesia Care Unit ("PACU").  In this position, Ms. Clifford was responsible for assisting the Nurse Manager in managing the 24-hour operation of the PACU as well as functioning as a staff nurse as necessary.

### II.   Ms. Clifford Requests FMLA Leave, Initially Returns To Work With No Restrictions, But Then Provides Another Form Stating Restrictions Are Necessary For Her To Return To Work.

On or about December 21, 2018, Ms. Clifford requested leave under the Family and Medical Leave Act with an estimated return to work date of January 7, 2019. Ms. Clifford's doctor indicated the leave was needed as a result of "cerebral hemorrhage, hypertension."   On approximately January 4, 2019, Ms. Clifford submitted a Health Release Form completed by her doctor stating she could return to work on January 7, 2019, *with no restrictions. See* Exhibit B. Consistent with her doctor's directions, Ms. Clifford returned to work in her RN Unit Coordinator position with no restrictions on or about January 8, 2019.

Ms. Clifford continued to work with no restrictions until she submitted a letter from her doctor on January 29, 2019. *See* Exhibit C.  Despite the previous Health Release Form stating Ms. Clifford could return to work on January 7, 2019 with no restrictions (and the fact that she had, in fact, returned to work several weeks before), this letter indicated Ms. Clifford could return to work only if she did not take night calls for two (2) months.  Because this letter conflicted with the previous Health Release Form submitted by Ms. Clifford, AMC requested she have her doctor complete an updated Form.  Ms. Clifford provided the updated Form, which indicated that Ms. Clifford could not take night calls for three (3) months (despite the letter only days earlier stating the restriction should be for two (2) months). *See* Exhibit D.  AMC agreed to this request.

---

defenses that may exist to the Charge and Charging Party's allegations.  AMC requests that any efforts to contact its current or former managers be directed through its counsel.

Moreover, the concerns from multiple co-workers raised questions about whether February 19 was the first time Ms. Clifford jeopardized patient care by violating policy, or whether it was simply the first time such a violation was discovered. This decision was communicated to Ms. Clifford in July 2019.

## DISCUSSION

In her Charge, Ms. Clifford alleges she was demoted and discharged due to her disability. The facts in no way support these allegations. Even assuming Ms. Clifford's medical condition constitutes a disability for purposes of the ADA (which AMC in no way admits), the evidence does not suggest AMC took any adverse action against Ms. Clifford or harassed her because of her medical condition.

As an initial matter, contrary to the allegations in her Charge, Ms. Clifford was never demoted from her position of RN Unit Coordinator. She was hired into this position and held the position through the end of her employment with AMC. Indeed, as reflected in Exhibit F, Ms. Clifford identifies herself as the Coordinator in March 2019 despite her sworn testimony in her Charge stating she was demoted from that position in January 2019.

Further, no basis exists to infer that her medical condition played any role in the decision to terminate her employment. As explained in detail above, Ms. Clifford's employment was terminated due to her violation of policy regarding the administration of heparin. Ms. Clifford's violation of this policy created a significant risk to the health of a patient in Ms. Clifford's care.

Finally, while Ms. Clifford contends she was "harassed" about her request not to take night calls, she fails to provide any evidence to support this allegation. At most, AMC requested Ms. Clifford provide an updated Health Release Form given that her doctor initially released her to work with no restrictions but then provided a letter several weeks later stating she could return to work only if she did not take night calls for a period of time. Requesting an updated Form in no way constitutes harassment, and the lack of any merit to this allegation is further confirmed by the fact that AMC granted Ms. Clifford's request not to take night calls for three (3) months.

*of course not*

## CONCLUSION

For the reasons set forth above, AMC respectfully requests that the EEOC issue a "no-cause" finding with respect to Ms. Clifford's Charge of Discrimination.

Sincerely yours,

GREGORY, DOYLE, CALHOUN & ROGERS, LLC

Charles L. Bachman, Jr.
For the Firm



# GEORGIA DEPARTMENT OF LABOR
P.O. BOX 740052  ATLANTA, GA 30374
404-232-3100 (Phone) / 404-656-2482 or 2304 (Fax)

RECEIVED
JUL 29 2019
BY: D.A

MAILED      07/24/19
3500

REPLY BEFORE    08/05/19

DESTINY CLIFFORD

***-**-5400

WELLSTAR ATLANTA MEDICAL CENT

303 PARKWAY DR NE
ATLANTA, GA 30312

GA DOL ACCT NO.

FAX OR MAIL YOUR REPLY - NOT BOTH
(see instructions below)

## NOTICE OF CLAIM FILING AND REQUEST FOR SEPARATION INFORMATION

Your former employee has filed a claim for unemployment insurance.

Information is needed to determine the claimant's eligibility for benefits under the Georgia Employment Security Law. Please complete, in detail, the attached questionnaire, date and sign in the spaces provided and submit **BEFORE 08/05/19.** Answering each question carefully and thoroughly may help you avoid a call for clarification of your answer. You **MAY** be contacted by phone, but **ONLY** if additional information is needed to make a determination of eligibility for benefits.

RECEIVED

JUL 20

BY:

### FAX INSTRUCTIONS

If you fax your response, please:

- do not send a fax transmittal sheet.
- do not fax this information letter if you use the attached questionnaire.
- DO NOT mail your response.

### GENERAL INFORMATION

If a timely response is received, and there is a disqualification placed on this claim, there will be no charges to your unemployment insurance tax account.

If the enclosed questionnaire is not applicable to the reason for separation, or if you need to furnish additional facts, attach separate sheets of paper. It will be necessary to include the employee's name and social security number on each sheet.

OCGA Section 34-8-256 of the Employment Security Law provides penalties for making false statements or failing to disclose material facts concerning unemployment insurance claims.

Employers that fail to respond to written requests for information from the Georgia Department of Labor (GDOL) with adequate information and/or by the specified deadline, on at least three separate occasions within the current calendar year, without substantial good cause, will be charged for benefits paid on subsequent claims regardless of whether the GDOL's benefits determination is later reversed on appeal or if an overpayment of benefits is established.

Are you interested in protecting your bottom line? Improve your UI separation information exchange process by participating in SIDES E-Response, a free web-based system to electronically receive and respond to requests for separation information. Go to www.dol.state.ga.us/spotlight, select Employer Separation E-Response under Employer Spotlights to register today.



1

DOL-1199FF (1)   (R-10/13)
UCFF01

WELLSTAR ATLANTA MEDICAL CENT      CENTRAL EXAMINING UNIT
404-656-2482 or 2304 (Fax)

DESTINY CLIFFORD      REPLY BEFORE    08/05/19
***-**-5400



## EMPLOYER'S INFORMATION ON DISCHARGE FOR FAILURE TO OBEY ORDERS, RULES OR INSTRUCTIONS OR FAILURE TO PERFORM THE DUTIES FOR WHICH HIRED.

1. What date was the employee advised he/she was discharged? _July 15th 2019_

2. What was the reason this person was discharged on this particular day? Give full details.
   _Ms. Clifford was discharged for Violation of Policy MU-70-01-Continuous IV Heparin therapy Procedure. This was due to her accepting a patient from the OR into the unit with a Heparin infusion and later delivering the patient to the medical surgical floor with the Heparin not being Connected to the IV pump._

3. Who told this employee that he/she was discharged? (Name/Title) _Nerissa thompson - Nurse Manager and Vangie Dennis - Director of Periop Services._

4. Explain in detail the effect the employee's actions had on your business? _Failure to connect a patient to the IV Pump is a serious violation of the Joint Commission National Patient Safety Goals NPSG.03.05.01 and could have resulted in the patient dying._

5. Explain the policy, order, rule or instruction this employee failed to follow. _Please see attached._

   a. What date(s) did the violation described above occur? _2-19-2019_
   b. When was this employee advised of the rule or policy? _New Hire Orientation on 8-28-17_
   c. How would this employee have known about the rule or policy prior to violation? _Ms. Clifford received Orientation and training unto on 8-28-17. Safety protocol are covered then a) were a) ~~during~~ this information is covered in Nursing Education._

6. Give exact dates and details about any warnings given to the employee. If employee was advised he/she was in danger of losing his/her job, explain who told him/her, whether the warning was written or verbal and the nature of the warning. _On 3/6/2019 Ms. Clifford was placed on investigatory leave pending investigation into the Heparin violation. She was informed that the Heparin violation is a serious ~~violation~~ violation of the National Patient Safety Goals._



DESTINY CLIFFORD

\*\*\*-\*\*-5400

7. If the discharge did not occur within a reasonable time from the date of the incident, what was the reason for the delay? Due to the nature of the violation, the case was forwarded to the Corporate office for additional review, as well as in house legal counsel.

## PLEASE PROVIDE THE FOLLOWING INFORMATION:

If employee was/will be/is being paid any type of payment (severance, separation, wages in lieu of notice, bonus, profit sharing, etc.) furnish the type, amount, period covered and date issued. DO NOT INCLUDE VACATION PAY.

Type _____     Amount _____

Period - from _____  to  _____

Date above payment(s) was/will be issued to employee  _____

Dates of employment:  Hired _____   Last worked _____

Average weekly wage amount (before taxes and not including overtime) _____

Did this employee earn at least $7,300 in your employ?    Y __  N __

If not, give amount of gross earnings _____

Federal ID Number _____

Our records indicate your Georgia unemployment tax account number is

If this is not your account number, please furnish the correct number _____.

Additional information may be furnished. If you attach separate sheets of paper, please include the employee's name and Social Security number on each sheet.

8-1-2019 _____     _Sara Boston_____     Sr. HR Consultant
Date                           Signature                       Title

404-265-3510
Telephone Number

DOL—442B3(R÷4/13)
NM2051

EMPLOYER COPY PRINTED

## GEORGIA DEPARTMENT OF LABOR
## CLAIMS EXAMINER'S DETERMINATION



| | |
|---|---|
| SSN | ***-**-5400 |
| BYB? | 07/21/19 |
| CWB | 07/21/19 |
| ACCT# | 102477-07 |

3500
ATLANTA
223 COURTLAND ST NE
SUITE 200
ATLANTA, GEORGIA 30303
FAX # (404) 656-3519

CLAIMANT

DESTINY CLIFFORD
265 18TH ST APT 2334
ATLANTA GA        30363

EMPLOYER

WELLSTAR HEALTH SYSTEM INC
677 CHURCH ST
MARIETTA  GA  30060

### SECTION I - CLAIM DETERMINATION

Benefits are allowed as of 07/21/19.

### SECTION II - LEGAL BASIS FOR DETERMINATION

Section 34-8-194 (2)(A) of the Employment Security Law says that you cannot be paid unemployment benefits if you were fired from your most recent employer for not following your employer's rules or orders.  In addition, you may not be paid unemployment benefits if you were fired for failing to perform the duties for which you were hired, if that failure was within your control.  You also cannot be paid benefits if you were suspended for any of these same reasons.  The law says that your employer has to show that discharge or suspension was for a reason that would not allow you to be paid unemployment benefits.  If you cannot be paid unemployment benefits under this section of the law, you may qualify at a later time.  To do this, you must find other work and earn wages covered under unemployment law.  The covered wages must be at least ten times the weekly amount of your claim.  If you then become unemployed through no fault of your own, you may reapply for unemployment benefits.

### SECTION III - REASONING

You were fired for failing to obey rules, orders, instructions or the established procedures of your employer when you failed to connect a patient to an IV pump.  You have stated you did not fail to comply.  For you to be disqualified, your employer must show that you failed to work as required.  Your employer has not done so.  Therefore, you can be paid unemployment benefits.

### SECTION IV - ACCOUNT CHARGEABILITY

NOTICE TO EMPLOYER:

Signed, adequate and timely separation information was received.
Your account, 102477-07, will be charged for benefits paid on this claim.  You will not be charged more in benefits than wages paid to this individual.

### SECTION V - APPEAL RIGHTS

NOTE: This determination will become final unless you file an appeal on or before 10/21/19. If you file an appeal you must continue to report on your claim as instructed, or you will not be paid if you win your appeal.  You will be required to repay the benefits received during the disqualification period, if a determination allowing benefits is reversed by an appeal decision. Refer to the Benefit Rights Information booklet or contact an office of the Georgia Department of Labor for more details.

| Georgia Department of Labor | 10/01/19 | 10/04/19 |
|---|---|---|
| Claims Examiner | Date of Interview | Mail Date |

—



GEORGIA DEPARTMENT OF LABOR - APPEALS TRIBUNAL
148 Andrew Young Intl Blvd NE,Ste 525, Atlanta,GA 30303-1734
404-232-3900  Fax 404-232-3901
appeals@gdol.ga.gov

### DECISION OF ADMINISTRATIVE HEARING OFFICER - DOCKET# 23032-19

| | | | |
|---|---|---|---|
| Appealing Party | Employer | Decision Mailed | 11/13/19 |
| Appeal Filed | 10/23/19 | Appeal Rights Expire | 11/28/19 |

Claimant
DESTINY CLIFFORD

DESTINY CLIFFORD
265 18TH ST APT 2334
ATLANTA GA 30363



Employer
WELLSTAR HEALTH SYSTEM INC

O.C.G.A. SECTION AND ISSUE INVOLVED:  O.C.G.A. Section 34-8-192(c).
Whether the appeal was filed within 15 days of the release date of the
determination.

FINDINGS OF FACT:  The administrative determination being appealed was
released on 10/04/19.  The appeal was filed on 10/23/19.

REASONS FOR RULING:  Section 300-2-5-.02(1)(b) of the Rules of the
Georgia Department of Labor and O.C.G.A. Section 34-8-192(c) provide
that any determination released by the Department becomes final unless
it is appealed by a party of interest within 15 days of the
determination release date.  In the present case the evidence shows no
error by the Department of Labor or other circumstances that would
extend the time limit provisions of the Law.

An appeal is considered timely if postmarked by the U.S. Postal
Service, delivered, or filed in person within 15 days of the mailing
date of the determination.  A postage meter mark will not be
considered in determining the timeliness of an appeal.

RULING:  The appeal was not timely filed.  Therefore, the
determination of the claims examiner has not been changed and is
affirmed.

DANA JACKSON
Administrative Hearing Officer

See reverse side

DOL-449(R-09/19

DESTINY CLIFFORD

Docket# 23032-19
Page 2

This is to certify that this decision was mailed on the above date by
the clerk of the Appeals Tribunal.

This decision will become final unless you file an appeal by the
deadline.  Appeal rights expire 15 days after the decision is mailed.
If you wish to file an appeal, submit a request online at
dol.georgia.gov, in writing by email to boardofreview@gdol.ga.gov,
or fax to 404.232.3339.  Appeals filed by email or fax are considered
GeorgianDept.date Labor Appeals Tribunal
148 Andrew Young Intl Blvd NE, Ste 525
Atlanta, GA 30303-1734

COPIES OF THIS DECISION WERE MAILED TO

DESTINY CLIFFORD                        WELLSTAR HEALTH SYSTEM INC
265 18TH ST APT 2334                    677 CHURCH ST
ATLANTA GA 30363                        MARIETTA
                                        GA  30060

```
IM48                      FACT FINDING INQUIRY                      10/25/19
S01  SSN       5400  BYB  07 21 19  CWB  07 21 19  EMPLID  8953     14:21:22
DESTINY CLIFFORD          FACT FINDING OF: CLAIMANT    DATE ENTERED 10/01/19
SEPARATION                EMPLOYER NAME    WELLSTAR HEALTH SYSTEM INC
                          TYPE ISSUE       DISCHARGE
```

.0-1, 12:30PM CT ON INTERNET. INSUFFICIENT. 404-936-2689. SPOKE WITH CLAIMANT.
\DDRESS VERIFIED. EMPLOYER STATEMENT READ TO CLAIMANT. REBUTTAL.
: DENIED CONPLETELY MY EMPLOYER'S ALLEGATIONS BECAUSE THE IV TUBE WAS CONNECTED
O THE IV PUMP THAT IS A VERY SIMPLE PROCEDURE. ALL I HAD TO DO WAS TO
)ISCONNECT THE IV FROM OUR PUMP TO CONNECT IT BACK TO THE PUMP OF THE STEP
)OWN UNIT. I HAVE BEEN PERFORMING THAT DUTY WITHOUT ANY DIFFICULTY AT ALL.
'HEIR STATEMENT WAS A LIE. NO, I DID NOT HAVE A WITNESS STATEMENT BECAUSE I
)ONT REMEMBER WHO WAS THERE AT THAT TIME OR I DID NOT PAY ANY ATTENTION DUE TO
'HE FACT THAT WAS NOT A PROBLEM AT ALL. THEY WERE JUST TRYING TO FIND A WAY
'O LET ME GO DUE MY ACCOMODATION UPON MY RECOVERY FROM A STROKE. YES, I WAS
\WARE OF THE POLICY. APPEAL RIGHTS GIVEN. WV



IA:      PF: 3-PREVMENU  4-MN00  5-PRT  7-BKWD  8-FRWD  9-PSCR  11-NA

EEOC Form 5 (11/09).

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 410-2019-07187 |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Destiny A. Clifford | (404) 936-2689 | 1972 |

Street Address                    City, State and ZIP Code

285 18th Street, Apartment 2334, Atlanta, GA 30363

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| WELLSTAR ATLANTA MEDICAL CENTER | 500 or More | (404) 265-4000 |

Street Address                    City, State and ZIP Code

303 Parkway Drive N.E., Atlanta, GA 30312

**AA**

| Name | No. Employees, Members | |
|---|---|---|

Street Address                    City, State and ZIP Code

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| | Earliest      Latest |
| ☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | 01-15-2019      07-15-2019 |
| ☐ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ GENETIC INFORMATION | |
| ☐ OTHER (Specify) | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I was hired by the above-named employer on August 28, 2017, as a Clinical Coordinator. I am an individual with a disability. On January 8, 2019, I returned back to work off medical leave. My doctor requested that I not work "Night Calls" for the next three months. Nerissa Thompson, PACU Supervisor, harassed me about my restriction of not working "Night Calls." On or about January 15, 2019, I was demoted from my Clinical Coordinator position to a Charge Nurse position. On March 6, 2019, I was placed on administrative leave pending an investigation. On July 15, 2019, I was discharged.

II. No reason was given to me for my demotion. The reason given for my discharge was "Violation of Wellstar policy."

III. I believe that I have been discriminated against because of my disability, in violation of Title I of the Americans with Disabilities Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| | JUL 2 2 2019 |
| Jul 22, 2019 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date                    Charging Party Signature | EEOC-ATDO |

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

### DISMISSAL AND NOTICE OF RIGHTS

| To: | Destiny A. Clifford<br>285 18th Street<br>Apartment 2334<br>Atlanta, GA 30363 | From: | Atlanta District Office<br>100 Alabama Street, S.W.<br>Suite 4R30<br>Atlanta, GA 30303 |
| --- | --- | --- | --- |



|  | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
| --- | --- | --- | --- |
| EEOC Charge No. | EEOC Representative | | Telephone No. |
| **410-2019-07187** | **Triet Bui,**<br>**Investigator** | | **(404) 562-6948** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

|  | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| --- | --- |
|  | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
|  | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
|  | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| X | The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge. |
|  | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
|  | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

|  | For | 02-19-2021 |
| --- | --- | --- |
| Enclosures(s) | **Darrell E. Graham,**<br>**District Director** | (Date Issued) |

| cc: | Chuck Bachman, Esq.<br>GREGORY, DOYLE, CALHOUN & ROGERS, LLC<br>49 Atlanta Street Southeast<br>Marietta, GA 30060 |
| --- | --- |



Nerissa Thompson

GM, you can take the day off. We only have 12 patients

Would like to have a discussion about the challenges on the floor regarding nurses needs for assistance, failure to take lunches, and giving consideration to the Charge Nurse if the nurse is engaged in patient rotation.

I will set up a meeting with Vangie

Okay thanks.

Hey Nerissa I am the only one here. Patients are coming out and O can't make calls to follow up on nurses so OR is on hold.